# EXHIBIT "A"

By:  Steven M. Coren, Esquire
     Benjamin M. Mather, Esquire
     Andrew J. Belli, Esquire
Attorney ID Nos. 32140; 89959; 208100
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
Bmather@kcr-law.com
Abelli@kcr-law.com
(215) 735-8700

Attorneys for Plaintiffs

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC.<br>2040 Whitfield Avenue<br>Sarasota, FL 34243, | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY |
| ARCHER PHARMACEUTICALS, INC.,<br>2040 Whitfield Avenue<br>Sarasota, FL 34243, and, | APRIL TERM 2014 |
| ROBERT ROSKAMP<br>420 Golden Gate Point<br>PH 900<br>Sarasota, FL 34236, | Civil Action No. |
|           Plaintiffs,<br>v.<br><br>ALZHEIMER'S INSTITUTE OF AMERICA,<br>INC.<br>7837 Parallel Parkway<br>Kansas City, KS 66112,<br><br>ALZHEIMER'S INSTITUTE OF AMERICA<br>FOUNDATION, INC.<br>Office 211 North Broadway<br>Suite 3600<br>St. Louis, MO 63102, | |

Case ID: 140402014

RONALD SEXTON
2900 Verona Road
Mission Hills, KS 66208

                        Defendants.

## PRAECIPE TO ISSUE WRIT OF SUMMONS

TO THE PROTHONOTARY:

    Kindly Issue a Writ of Summons against the Defendants in the above-captioned action.

                        **KAUFMAN, COREN & RESS, P.C.**

                        /s/ Andrew J. Belli
                        Steven M. Coren, Esquire
                        Benjamin M. Mather, Esquire
                        Andrew J. Belli, Esquire
                        Two Commerce Square, Suite 3900
                        2001 Market Street
                        Philadelphia, PA 19103
                        scoren@kcr-law.com
                        bmather@kcr-law.com
                        abelli@kcr-law.com
Dated: April 18, 2014   (215) 735-8700

Case ID: 140402014

C.P.97

# Commonwealth of Pennsylvania

## CITY AND COUNTY OF PHILADELPHIA

SUMMONS
*CITACION*

The Roskamp Institute, Inc.,
Archer Pharmaceuticals, Inc.,
and Robert Roskamp

COURT OF COMMON PLEAS Attested by

PROTHONOTARY
18 APR 2014 10:45 am

April _____

Term 20____

No. _____

*vs.*

Alzheimer's Institute of America, Inc.,
Alzheimer's Institute of America Foundation,
Inc., and Ronald Sexton

To[1]

Alzheimer's Institute of America, Inc.,
Alzheimer's Institute of America
Foundation, Inc., and Ronald Sexton

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante[2]*

The Roskamp Institute, Inc.,
Archer Pharmaceuticals, Inc.,
and Robert Roskamp

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*



JOSEPH H. EVERS
*Prothonotary*

By _____

140402014
18 APR 2014 10:45 am
J. MURPHY

Date _____

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

10-208 (Rev. 6/00)

Case ID: 140402014

# COURT OF COMMON PLEAS

April _____ Term, 20 __14__ No. _____

The Roskamp Institute, Inc.,
Archer Pharmaceuticals, Inc.,
and Robert Roskamp

vs.

Alzheimer's Institute of America, Inc.,
Alzheimer's Institute of America Foundation, Inc.,
and Ronald Sexton

**SUMMONS**

Case ID: 140402014

## COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

**X** 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

      a. Uniform Commercial Code transactions;

      b. Purchases or sales of business or the assets of businesses;

      c. Sales of goods or services by or to business enterprises;

      d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

      e. Surety bonds;

      f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

      g. Franchisor/franchisee relationships.

3. Actions relating to trade secret or non-compete agreements;

**X** 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

5. Actions relating to intellectual property disputes;

6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

8. Actions relating to corporate trust affairs;

9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

## COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____ 1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

__X__ 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

           a.    Uniform Commercial Code transactions;

           b.    Purchases or sales of business or the assets of businesses;

           c.    Sales of goods or services by or to business enterprises;

           d.    Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

           e.    Surety bonds;

           f.    Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

           g.    Franchisor/franchisee relationships.

_____ 3. Actions relating to trade secret or non-compete agreements;

__X__ 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____ 5. Actions relating to intellectual property disputes;

_____ 6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____ 7. Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____ 8. Actions relating to corporate trust affairs;

_____ 9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____ 10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.



## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CIVIL TRIAL DIVISION

*THE ROSKAMP INSTITUTE, INC. ETAL*                    *April Term 2014*

*VS*                                                 *No. 02014*   **DOCKETED**

*ALZHEIMER'S IN*                                              **AUG 1   2014**

                                                     **C. HART**
        **COMMERCE PROGRAM**                   **CIVIL ADMINISTRATION**
      **CASE MANAGEMENT ORDER**
          **COMPLEX TRACK**

**AND NOW,** 01-AUG-2014, it is Ordered that:

1. The case management and time standards adopted for Commerce Program, complex track cases shall apply and are incorporated.

2. All *Discovery* shall be completed not later than *08-SEP-2015*.

3. *Plaintiff(s)* shall identify and submit *Curriculum Vitae and Expert Reports* for all expert witnesses intended to testify at trial to all other parties not later than *08-SEP-2015*.

4. *Defendant(s) and any additional defendant(s)* shall indentify and submit *Curriculum Vitae and Expert Reports* for all expert witnesses intended to testify at trial to all other parties not later than *02-NOV-2015*.

5. All *Pretrial Motions* (other than Motions in Liminc) shall be filed not later than *16-NOV-2015*.

6. A *Settlement Conference* may be scheduled any time after *01-FEB-2016*.

7. A *Pretrial Conference* may be scheduled any time after *07-MAR-2016*.

8. *It is expected that the case will be ready for trial 04-APR-2016*, which is the earliest trial date pursuant to Pa.R.C.P. 212.1 and counsel should anticipate trial to begin expeditiously thereafter.

9. All counsel are under a continuing obligation and are hereby Ordered to serve a copy of this Order upon all unrepresented parties and upon all counsel entering an appearance subsequent to the entry of this order.

*BY THE COURT:*

The Roskamp Institute, -CMOIS

**GARY GLAZER, J.**
*TEAM LEADER*

KTI187419 (dfcec – rev 12/13 qa)

14040201400013

**FOX ROTHSCHILD LLP**
BY:  Peter C. Buckley and Evan R. Luce, Esquires
IDENTIFICATION NOS.  93123 and 318956
2000 MARKET STREET, TWENTIETH  FLOOR
PHILADELPHIA, PA  19103-3222
(215) 299-2000

ATTORNEYS FOR DEFENDANTS
ALZHEIMER'S INSTITUTE OF
AMERICA, INC. and ALZHEIMER'S
INSTITUTE OF AMERICA
FOUNDATION, INC.

THE ROSKAMP INSTITUTE, INC.,
ARCHER PHARMACEUTICALS, INC. and
ROBERT ROSKAMP,

                                        Plaintiffs,

                    v.

ALZHEIMER'S INSTITUTE OF AMERICA,
INC. and ALZHEIMER'S INSTITUTE OF
AMERICA FOUNDATION, INC.,

                                        Defendants.

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

APRIL TERM, 2015

NO. 140402014

---

## PRAECIPE FOR RULE TO FILE COMPLAINT

TO THE PROTHONOTARY:

In accordance with Rule 1037(a) of the Pennsylvania Rules of Civil Procedure, please enter a rule upon Plaintiffs, The Roskamp Institute, Inc., Archer Pharmaceuticals, Inc. and Robert Roskamp, to file a complaint in connection with the above-captioned case within twenty (20) days of service thereof or suffer the entry of a judgment of non pros.

                         /s/ Peter C. Buckley
                         Peter C. Buckley, Esquire
                         Evan R. Luce, Esquire
                         FOX ROTHSCHILD LLP
                         2000 Market Street, 20th Floor
                         Philadelphia, PA  19103
                         (215) 299-2000
                         *Attorneys for Defendant,*
                         *Alzheimer's Institute of America, Inc. and*
Dated: May 28, 2015      *Alzheimer's Institute of America Foundation, Inc.*

Case ID: 140402014

THE ROSKAMP INSTITUTE, INC.,
ARCHER PHARMACEUTICALS, INC. and
ROBERT ROSKAMP,

                Plaintiffs,

         v.

ALZHEIMER'S INSTITUTE OF AMERICA,
INC. and ALZHEIMER'S INSTITUTE OF
AMERICA FOUNDATION, INC.,

                Defendants.

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

APRIL TERM, 2015

NO. 140402014

## RULE

        AND NOW, this ____ day of _____, 2015, upon praecipe of the

above-named Defendant, a Rule is hereby entered upon Plaintiffs, The Roskamp Institute, Inc.,

Archer Pharmaceuticals, Inc. and Robert Roskamp, to file a Complaint within twenty (20) days

after service of this Rule or suffer the entry of a judgment on non pros.

_____
PROTHONOTARY



140402014
28 MAY 2015 02:37 pm
P. MARTIN

Case ID: 140402014

## CERTIFICATE OF SERVICE

I, Evan R. Luce, Esquire, do hereby certify that service of a true and correct copy of the

foregoing Rule to File Complaint was made this day, via electronic filing, upon the following:

Steven M. Coren, Esquire
Benjamin M. Mather, Esquire
Andrew J. Belli, Esquire

Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103

*Attorneys for Plaintiffs,*
*The Roskamp Institute, Inc.,*
*Archer Pharmaceuticals, Inc. and*
*Robert Roskamp*


/s/ Evan R. Luce
Evan R. Luce, Esquire

Dated:  May 28, 2015

Case ID: 140402014

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| | **APRIL 2014** |
| | E-Filing Number: 1404033636    **002014** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| THE ROSKAMP INSTITUTE, INC. | ALZHEIMER'S INSTITUTE OF AMERICA, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2040 WHITFIELD AVE. SARASOTA FL 34243 | 7837 PARALLEL PARKWAY KANSAS CITY KS 66112 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ARCHER PHARMACEUTICALS, INC. | ALZHEIMER'S INSTITUTE OF AMERICA FOUNDATION, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2040 WHITFIELD AVE. SARASOTA FL 34243 | OFFICE 211 NORTH BROADWAY SUITE 3600 ST. LOUIS MO 63102 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ROBERT ROSKAMP | RONALD SEXTON |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 420 GOLDEN GATE POINT  PH 900 SARASOTA FL 34236 | 2900 VERONA RD MISSION HILLS KS 66208 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 3 | 3 | ☐ Complaint  ☐ Petition Action  ☐ Notice of Appeal  ☒ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less  ☒ More than $50,000.00 | ☐ Arbitration  ☐ Jury  ☐ Non-Jury  ☐ Other: | ☐ Mass Tort  ☐ Savings Action  ☐ Petition | ☒ Commerce  ☐ Minor Court Appeal  ☐ Statutory Appeals | ☐ Settlement  ☐ Minors  ☐ W/D/Survival |

| CASE TYPE AND CODE |
|---|
| 4F - FRAUD |

| STATUTORY BASIS FOR CAUSE OF ACTION |
|---|
| |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | **FILED PRO PROTHY** APR **18** 2014 **J. MURPHY** | YES        NO |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: THE ROSKAMP INSTITUTE, INC. , ARCHER PHARMACEUTICALS, INC. , ROBE

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| ANDREW J. BELLI | KAUFMAN, COREN & RESS, P.C. TWO COMMERCE SQUARE 2001 MARKET STREET, SUITE 3900 PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER |
|---|---|
| (215)735-8700 | (215)735-5170 |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 208100 | abelli@kcr-law.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| ANDREW BELLI | Friday, April 18, 2014, 10:45 am |

FINAL COPY (Approved by the Prothonotary Clerk)

By:  STEVEN M. COREN, ESQUIRE
       MATTHEW R. WILLIAMS, ESQUIRE
       DAVID M. DeVITO, ESQUIRE
**Attorney ID Nos. 32140; 91820; 310622**
**Kaufman, Coren & Ress, P.C.**
**Two Commerce Square, Suite 3900**
**2001 Market Street**
**Philadelphia, PA 19103**
**scoren@kcr-law.com**
**mwilliams@kcr-law.com**
**ddevito@kcr-law.com**
**(215) 735-8700**



**Attorneys for Plaintiffs**

| | |
|---|---|
| **THE ROSKAMP INSTITUTE, INC.,**<br>**ARCHER PHARMACEUTICALS, INC.,**<br>**and ROBERT ROSKAMP,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**ALZHEIMER'S INSTITUTE OF**<br>**AMERICA, INC., ALZHEIMER'S**<br>**INSTITUTE OF AMERICA**<br>**FOUNDATION, INC., and RONALD**<br>**SEXTON,**<br><br>**Defendants.** | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY**<br><br><br>**APRIL TERM, 2014**<br><br>**Civil Action No.: 02014**<br><br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION – COMPLAINT**

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHETHER YOU CAN GET LEGAL HELP.

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, Pa 19107
Telephone: (215) 238-1701

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notification. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Asociacion de Licenciados de Filadelfia
Servicio de Referencia e Informacion Legal
One Reading Center
Filadelfia, PA 19107
Telefono: (215) 238-1701

Case ID: 140402014

By:  STEVEN M. COREN, ESQUIRE
      MATTHEW R. WILLIAMS, ESQUIRE
      DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                                        **Attorneys for Plaintiffs**

---

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC., ARCHER PHARMACEUTICALS, INC., and ROBERT ROSKAMP, <br><br> Plaintiffs, <br><br> v. <br><br> ALZHEIMER'S INSTITUTE OF AMERICA, INC., ALZHEIMER'S INSTITUTE OF AMERICA FOUNDATION, INC., and RONALD SEXTON, <br><br> Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY <br><br><br> APRIL TERM, 2014 <br><br> Civil Action No.: 02014 <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

---

## <u>COMPLAINT</u>

Plaintiffs The Roskamp Institute, Inc. ("Roskamp Institute"), Archer Pharmaceuticals,

Inc. ("Archer") and Robert Roskamp ("Roskamp" and, together with Roskamp Institute and

Archer, collectively, the "Plaintiffs"), by and through their attorneys, file this Complaint and

hereby assert causes of action for fraud, aiding and abetting fraud, civil conspiracy, failure of

consideration and unjust enrichment against Defendants Alzheimer's Institute of America, Inc.

("AIA"), Alzheimer's Institute of America Foundation, Inc. ("AIA Foundation") and Ronald

1

Sexton ("Sexton" and, together with AIA and AIA Foundation, collectively, the "Defendants"), as follows:

## INTRODUCTION

1.     Plaintiff Roskamp Institute is a non-profit entity devoted to Alzheimer's Disease research; plaintiff Archer is a for-profit company that develops and commercializes drug treatments for Alzheimer's that grow out of Roskamp Institute's research; and plaintiff Roskamp is a businessman and philanthropist who invests in and pays for the activities of Roskamp Institute and Archer with his personal funds and holds significant ownership stakes in both companies.

2.     In performing their work, Roskamp Institute and Archer build on decades of knowledge they and other leaders in the field have developed regarding Alzheimer's Disease. This involves, among other things, performing testing on laboratory animals that contain a certain genetic mutation linked to Alzheimer's known as the Swedish Mutation, which was first discovered in the early 1990s.

3.     Defendants AIA and AIA Foundation purport to own certain patents covering the Swedish Mutation and certain types of transgenic animals that carry it.

4.     Based on Defendants' purported ownership of these patent rights, Plaintiffs entered into a Royalty Agreement with AIA in 2008, pursuant to which Plaintiffs agreed to pay Defendants millions of dollars and hand over a 25% equity interest in Archer.  In addition, the Royalty Agreement required Plaintiffs to surrender to AIA the rights to any discovery Plaintiffs made in the future while using Defendants' alleged patents.

2

5.      Plaintiffs have since made valuable scientific discoveries, including one that led to the issuance of a patent for a promising Alzheimer's drug treatment, which is now in advanced stages of development and regulatory approval.  Under their deal with Defendants, Plaintiffs were obligated to, and did, assign these rights to AIA.

6.      In turns out, however, that AIA's claims of patent ownership are part of an elaborate sham.  AIA conducts no research and sells no products.  It is, however, a serial litigant and shakedown artist.   In addition to bilking Plaintiffs out of their money, their Archer Shares, and their valuable patent rights, AIA has brought lawsuits accusing deep-pocketed defendants across the United States of infringing the same alleged patents.

7.      Though many targets of AIA's patent lawsuits elected to settle rather than spend millions of dollars fighting the charges, some resisted.  In a lawsuit AIA filed in the Eastern District of Pennsylvania in 2010, defendants Avid Radiopharmaceuticals and the University of Pennsylvania challenged AIA's standing on the grounds that AIA lacked the right to assert the patents it claimed to own.

8.      In 2012, a lengthy jury trial in the Eastern District exposed a sordid tale of fraud and deception by the scientists responsible for discovering the Swedish Mutation, who, with the help and encouragement of defendant Sexton, conspired to avoid the legitimate ownership claims of other entities and enrich themselves by concentrating the patent rights in AIA.

9.      Based on the revelations at trial, it is now clear that AIA procured its purported rights to the Swedish Mutation patents through fraudulent and illegal conduct and, as a result, has no legitimate interest in those patents as a matter of law.

10.     Consequently, it is equally clear that the Royalty Agreement, too, was a product of Defendants' fraud.  Accordingly, Plaintiffs bring this action to recover the damages they have

3

suffered and property they lost as a result of the deal Defendants fraudulently induced them to sign in exchange for the worthless right to use patents the Defendants falsely claimed to own.

## PARTIES

### The Plaintiffs

11.     Plaintiff Roskamp Institute is a corporation organized under laws of Florida with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

12.     Plaintiff Archer Pharmaceuticals is a corporation organized under the laws of Delaware with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

13.     Plaintiff Robert Roskamp is an individual resident of Florida with an address at 420 Golden Gate Point, PH 900, Sarasota, FL 34236.  Roskamp is the Chairman of the boards of directors of Roskamp Institute and Archer.

### The Defendants

14.     Defendant AIA is a corporation organized under the laws of Florida with a place of business at 7837 Parallel Parkway, Kansas City, KS 66112.

15.     Defendant AIA Foundation is a corporation organized under the laws of Delaware with a place of business at Office 211 North Broadway, Suite 3600, St. Louis, MO 63102.

16.     Defendant Ronald Sexton is an individual resident of Kansas with an address at 2900 Verona Road, Mission Hills, KS 66208.  On information and belief, Sexton is the majority owner and controlling shareholder of AIA and AIA Foundation.

17.     On information and belief, AIA and AIA Foundation are mere alter egos of Sexton.

4

Case ID: 140402014

## JURISDICTION AND VENUE

18.    This Court has personal jurisdiction over the Defendant pursuant to 42 Pa.C.S. § 5322 because, *inter alia*: (a) the Defendants, with the purpose of realizing a pecuniary interest therefrom, performed acts in Pennsylvania that are the subject of this Complaint; and (b) the Defendants expressly consented in writing to jurisdiction in Pennsylvania.

19.    Venue is proper in this Court pursuant to 42 Pa.C.S. § 931(c) and Pennsylvania Rules of Civil Procedure 1006 and 2179 because the Defendants expressly consented in writing to venue in courts located in Philadelphia.

## FACTUAL BACKGROUND

20.    Roskamp Institute is a non-profit research institution devoted to understanding the causes of and finding potential therapies for Alzheimer's Disease ("AD") and other neuro-degenerative disorders.

21.    Archer is a for-profit corporation focused on the commercial development of drug treatments for AD.

22.    AIA does not conduct any research or make any products, but purports to own certain patents and intellectual property rights relating to a genetic variation known as the Swedish Mutation, which is believed to cause AD.

23.    AIA's purported intellectual property rights included patents covering nucleic acids coding for the Swedish Mutation, U.S. Patent Number 5,455,169 (the "'169 patent"); transgenic mice carrying the Swedish Mutation, U.S. Patent Number 7,538,258 (the "'258 patent"); and certain other patents and intellectual property rights related thereto (collectively, the "Patents").

5

Case ID: 140402014

24.     Dr. Michael Mullan ("Mullan") is identified on both the '169 patent and the '258 patent as the sole inventor.

### Hardy's Team Discovers the London Mutation While Working at Imperial College

25.     Dr. John Hardy ("Hardy") began studying AD in 1979.  In 1985, he moved to St. Mary's Hospital Medical School in London, which later merged with Imperial College, where he started an AD laboratory and research program.

26.     Hardy was at all times the principal investigator and held overall responsibility for the lab at Imperial College.  Hardy eventually hired scientists from varied disciplines to work in his lab.  In approximately October 1988, Mullan joined Hardy's lab as a research fellow and Ph.D. student under Hardy.

27.     In 1990, Hardy, along with several Dutch scientists, wrote a paper describing a link between the amyloid precursor protein ("APP") and a disease called HCHWA-D, which, like AD, is characterized by presence of amyloid deposits in the brain.  This paper concluded that a mutation in the APP gene was responsible for HCHWA-D.  This genetic mutation came to be known as the "Dutch Mutation."

28.     After discovering the Dutch Mutation, Hardy and his team began searching for APP mutations relating to AD by analyzing exons 16 and 17 of the APP gene taken from a British family.  This led to the discovery of the first genetic mutation associated with AD, a change in codon 717 of the APP gene, which came to be known as the "London Mutation."

29.     In January 1991, a patent application was filed for the London Mutation in the United Kingdom.  The application named Hardy, Mullan and three others as co-inventors.

6

Case ID: 140402014

30.     Under the U.K. Patent Act of 1977, which provides that inventions made by employees in the course of their normal duties belong to the employer, the rights to the London Mutation invention were owned by Imperial College.

31.     The London Mutation inventors also suggested patenting transgenic animals carrying the mutation, but were advised by Imperial College's technology transfer arm, Imperial Exploitation Limited ("IMPEL"), that transgenic animals were not patentable under U.K. law. IMPEL's advice, however, turned out to be erroneous.

32.     In February 1991, a company called Athena Neurosciences, Inc. ("Athena") approached Imperial College, through Hardy, with a proposal to sponsor his team's research. On August 1, 1991, Imperial College, IMPEL and Athena executed a Sponsored Research Agreement (the "Athena Agreement"). In connection therewith, upon noticing IMPEL's error, Athena revised the U.K. patent application to cover transgenic animals with the London Mutation.

33.     Pursuant to the Athena Agreement, Athena received the exclusive rights to transgenic animals with the London Mutation, as well as any AD discoveries from Hardy's lab at Imperial College.

**Sexton, Mullan and Hardy Conspire to Avoid the Athena Agreement**

34.     Upon learning that IMPEL had given them erroneous advice, and believing that the rights relating to their discovery of the London mutation had been undervalued, Hardy and his team became disappointed with the Athena Agreement.

35.     At this time, Sexton, a businessman from Kansas City with no experience in scientific research arrived on the scene. Sexton saw a business opportunity in the Hardy team's research, and he furthered the perception that the Athena Agreement was a bad deal.

7

36.     Sexton suggested to Hardy and Mullan that he could offer them a deal that was much better than the Athena Agreement, and he successfully persuaded them to sign an agreement giving Sexton's company, Euroinvest Limited ("Euroinvest"), exclusive rights in their research.

37.     To effectuate the new deal with Sexton, however, they first needed to undo the Athena Agreement. In furtherance of that goal, and aided by Sexton and Clyde & Co. (a London law firm Sexton hired for the purpose), Hardy and Mullan made several attempts to challenge Imperial College's claim to the London Mutation patent.

38.     When Imperial College rejected their initial attempts, Mullan, Hardy and Dr. Alison Goate (at the time a junior scientist on Hardy's team) wrote a letter to Imperial College in which they claimed that Mullan had conceived the London Mutation before he became employed at Imperial College, and therefore the college had no rights to the invention.

39.     Imperial College, however, remained unswayed and rejected the claim that Mullan had made the invention before coming to the college.

40.     As Hardy and Goate would later testify, the allegations they made in the letter to Imperial College regarding Mullan's role in the discovery of the London Mutation were false. Goate testified that she engaged in this "scheme to cheat Imperial" because she felt pressure from Hardy, Mullan and Sexton.

41.     Unable to get out of the Athena Agreement and seeking to avoid Athena's option on any new APP mutations, the scientists on Hardy's team (along with Sexton) agreed they would not identify any additional mutations while working at Imperial College.

8

Case ID: 140402014

42.     To continue the work while avoiding making any further discoveries at Imperial College, Hardy decided to move his laboratory from Imperial College to the University of South Florida ("USF").

43.     At Hardy's request, USF hired Mullan as a research assistant in Hardy's laboratory.  Mullan arrived at USF in December 1991 and began work setting up Hardy's lab. Hardy, meanwhile, remained at Imperial College until May 1992, waiting for the new lab to be constructed at USF.

**Hardy and His Team Discover the Swedish Mutation and Conspire to Ensure that Neither Imperial College Nor USF Acquire Any Rights in the Invention**

44.     In early 1992, a team of researchers at the Karolinska Institute in Sweden collected DNA samples from Swedish families with AD.  In February 1992, a Swedish scientist visited Hardy at Imperial College and delivered DNA samples from several of the Swedish families.

45.     Hardy decided to conduct genetic studies on two of the Swedish families, referred to as "F139" and "F144."  Hardy asked a lab technician at Imperial College, Henry Houlden, to conduct a "GT12 analysis" on the DNA from the two families.

46.     Houlden performed the analysis over several weeks and provided the results to Hardy in London.  Hardy analyzed the data from Houlden's analysis and concluded that it suggested a strong likelihood of mutation on the APP gene in both families.

47.     To prevent Imperial College and Athena from obtaining any rights to the new mutation, Hardy instructed Houlden to send selected DNA samples from the two families to Mullan to have them sequenced in Florida.

9

48.     Although Mullan lacked the ability to sequence the DNA on his own, Hardy knew that Fiona Crawford (like Mullan, then a Ph.D. student who worked on Hardy's team at Imperial College), who had experience in DNA sequencing, would soon arrive in Florida.

49.     Upon her arrival, Crawford sequenced the DNA samples sent by Hardy at the Tampa Bay Research Institute (which was, notably, off-campus from USF).

50.     Crawford's sequencing revealed that the DNA of the affected Swedish family members did in fact contain a double mutation in exon 16 at codons 670 and 671.  This discovery became known as the "Swedish Mutation."

51.     In late April 1992, work immediately began on a patent application for the newly-discovered Swedish mutation, as well as a publication describing the discovery, which would ultimately be published in *Nature Genetics*.

52.     Upon discovering the Swedish mutation, Hardy and Mullan, with the help of Sexton and his attorneys, resolved to ensure that neither Imperial College nor USF would obtain any rights to the invention.

53.     In furtherance of their plan, Mullan and Hardy agreed that Hardy's name would not appear on any patent application or publication regarding their discovery of the Swedish Mutation.  They made this decision because, at the time of the discovery, Hardy was still an employee of Imperial College subject to the Athena Agreement.  Thus, leaving Hardy's name off of the invention served to prevent Imperial College or Athena from obtaining rights to the invention.

10

Case ID: 140402014

54.     Hardy and Mullan also knew, however, that under USF's regulations and Florida law, USF would have rights to the Swedish Mutation discovery because Mullan was a USF employee.

55.     To solve the USF problem, Hardy, Mullan and Sexton devised a plan to have USF waive its rights to the Swedish Mutation.

56.     To accomplish this, Sexton's lawyers sent USF a letter describing the work Hardy and Mullan had done on the London Mutation and their resulting dispute with Imperial College over the rights to that invention.  Notably, the letter did not disclose the discovery of the Swedish Mutation or any information about the work that had been done in Florida.

57.     Dr. George Newkome, USF's Vice President for Research interpreted the letter as requesting USF's confirmation that the university would not assert rights in Hardy's and Mullan's London Mutation research.  As prepared by Sexton's lawyers, the letter asked USF to agree that "all ownership of rights in any work carried out by [Hardy and Mullan] and inventions made by them (whether before or after the date of this letter) belong exclusively to Hardy and Mullan."

58.     Having been advised of the scientists' dispute with Imperial College, Newkome wished to draw a clear line between research belonging to Imperial College and research at USF. Newkome met with Hardy, Mullan and Sexton to discuss the letter, but was never told about the discovery of the Swedish Mutation.  In fact, Newkome was affirmatively told that because the new lab being built for Hardy's team at USF had yet to be completed, "there was really nothing new going on."

11

59.     At the meeting, based on the representations made by Hardy, Mullan and Sexton, Newkome revised the letter to provide that USF would agree that any work done or inventions made by Hardy and Mullan prior to August 15, 1992 (the start of the upcoming semester at USF, Hardy's first) would belong to Hardy and Mullan.  On May 4, 1992, Newkome signed the letter as revised.

**In Furtherance of the Scheme, the Rights to the Swedish Mutation Are Assigned to AIA**

60.     After successfully tricking USF into ostensibly waiving its rights to the Swedish Mutation, Sexton incorporated AIA the next day, May 5, 1992.

61.     The patent application for the Swedish Mutation, listing Mullan as the sole inventor, was filed on June 4, 1992.

62.     Mullan assigned all of his rights in the Swedish Mutation invention to AIA on July 15, 1992.

**AIA Fraudulently Induces Roskamp Institute and Archer to Enter into the Royalty Agreement Concerning the Use of AIA's Patents**

63.     Believing AIA to be the rightful owner of the Patents and wishing to use the Patents in their research and development activities, Roskamp and Archer engaged in negotiations with AIA concerning the use of the Patents.

64.     In or about February 2008, Roskamp, Archer and AIA entered into a contract dated as of February 7, 2008 (the "Effective Date") entitled Agreement for Consideration and Royalty Payments Paid to Alzheimer's Institute of America, Inc. (the "Royalty Agreement").

12

65.     The Royalty Agreement provides that it is governed by the laws of Pennsylvania, and that all parties agree to submit to jurisdiction in the courts located in Philadelphia, Pennsylvania.

66.     Pursuant to the Royalty Agreement, Roskamp and Archer acquired a revocable, non-exclusive license to use the Patents.

67.     In return, Roskamp and Archer promised AIA the following: (a) payment of $1,000,000 upon execution of the Royalty Agreement, plus additional future payments totaling $11,750,000 linked to certain milestones; (b) twenty-five percent (25%) of the outstanding equity shares of Archer as of the Effective Date (the "Archer Shares"); and (c) assignment to AIA of their rights to any inventions discovered through the use of the Patents.

68.     Following execution of the Royalty Agreement, through the use of the Patents, Roskamp Institute scientists discovered that the drug Nilvadipene, originally developed to treat high blood pressure, could be used to treat AD.  Roskamp Institute obtained a patent on this discovery, U.S. Patent Number 8,236,346 (the "'346 patent"), which was assigned to AIA pursuant to the Royalty Agreement.

### Roskamp and Archer Learn AIA Has No Right to the Patents and Thus Procured the Royalty Agreement Through Fraud

69.     On November 24, 2010, AIA filed a lawsuit against Avid Radiopharmaceuticals, Inc. ("Avid") and the Trustees of the University of Pennsylvania ("Penn") in the United States District Court for the Eastern District of Pennsylvania (the "District Court"), Case No. 2:10-cv-06908 (the "Avid Action").

70.     In the Avid Action, AIA sought damages from Avid and Penn based on allegations that they had willfully infringed both the '169 patent and the '258 patent.

13

Case ID: 140402014

71.     The Avid Action was not the first such infringement lawsuit brought by AIA.  In fact, AIA had previously filed multiple lawsuits against other entities associated with AD research.  Many of the defendants in these cases chose not to fight AIA and settled, some paying AIA millions of dollars.

72.     Avid and Penn contested AIA's charges and sought dismissal of the Avid Action on the grounds that AIA lacked standing to assert its purported rights under the '169 and '258 patents.

73.     A trial was held regarding the issue of AIA's standing in the Spring 2012.  Hardy, Mullan, Goate, Houlden, Crawford and Newkome were among those that testified.

74.     After hearing the testimony, the jury found that (a) Mullan was not, in fact, the sole inventor of the '169 and '258 patents; (b) Hardy was at least a co-inventor of the '169 and '258 patents; and (c) USF, Mullan's employer at the time the application for the '169 patent was filed, did not knowingly and intentionally waive its rights to the invention.

75.     Accordingly, based on the jury's findings, the District Court concluded that AIA lacked standing to assert the '169 and '258 patents and entered judgment in favor of Avid and Penn.

76.     On May 16, 2014, the U.S. Court of Appeals for the Federal Circuit affirmed the District Court's judgment without opinion.

## COUNT I - FRAUD (Against AIA)

77.     Paragraphs 1-76 above are incorporated by reference as if fully set forth herein.

Case ID: 140402014

78.     By licensing the Patents to Roskamp Institute and Archer pursuant to the Royalty Agreement, AIA intentionally misrepresented to Plaintiffs that AIA held a valid interest in the Patents that would be subject to the license.

79.     AIA at all times knew that it had obtained title to the Patents wrongfully and through fraudulent means and in fact lacked rights in the Patents as a matter of law.

80.     AIA made these misrepresentations with the intention that they be relied upon by Plaintiffs in entering into the Royalty Agreement.

81.     AIA's misrepresentations were material to Plaintiffs' decision to enter into the Royalty Agreement, and but for AIA's misrepresentations, Plaintiffs would not have entered into the Royalty Agreement.

82.     Plaintiffs reasonably relied upon AIA's misrepresentations to their detriment in entering into the Royalty Agreement.

83.     AIA's misrepresentations caused Plaintiffs to enter into the Royalty Agreement, when they were otherwise under no duty to do so.

84.     As the direct, foreseeable, and proximate result of AIA's misrepresentations, Plaintiffs have suffered and continue to suffer damages, as aforesaid, for which they are entitled to recover against AIA.

## COUNT II - AIDING AND ABETTING FRAUD (Against Sexton)

85.     Paragraphs 1-84 above are incorporated by reference as if fully set forth herein.

86.     AIA committed the tort of fraud against Plaintiffs as described herein.

15

87.     Sexton knowingly and substantially assisted AIA's tortious conduct by, among other things, facilitating the conspiracy by which AIA fraudulently obtained title to the Patents by depriving Imperial College and USF of their rights thereto.

88.     Sexton was aware of his role as part of AIA's illegal and tortious activity at the time he provided the assistance.

89.     Plaintiffs have suffered and continued to suffer damages in an amount to be proven at trial as a result of the tortious conduct aided and abetted by Sexton.

### COUNT III - CIVIL CONSPIRACY (Against All Defendants)

90.     Paragraphs 1-89 above are incorporated by reference as if fully set forth herein.

91.     Defendants combined and conspired to commit the unlawful acts of fraud described herein.

92.     As described herein, AIA and Sexton created a plan to defraud Plaintiffs by falsely representing their ownership of the Patents to Plaintiffs to fraudulently induce Plaintiffs to enter into the Royalty Agreement.

93.     Sexton furthered AIA's unlawful plan by, among other things, facilitating the conspiracy by which AIA obtained purported title to the Swedish Mutation patents by fraudulently depriving Imperial College and USF of their rights.

94.     Defendants' actions in furtherance of the conspiracy injured Plaintiffs, causing Plaintiffs to suffer damages in an amount to be proved at trial.

### COUNT IV – FAILURE OF CONSIDERATION (Against AIA)

95.     Paragraphs 1-94 above are incorporated by reference as if fully set forth herein.

96.     AIA at all times lacked rights in the Patents as a matter of law.

16

Case ID: 140402014

97.     Because AIA lacked rights in the Patents, the consideration bargained for by Plaintiffs in the Royalty Agreement did not pass, in whole or in part, to Plaintiffs.

98.     As a result of the failure of consideration, the Royalty Agreement is invalid and void, and Plaintiffs are entitled to the return of any and all consideration paid or provided to AIA pursuant to the Royalty Agreement, including but not limited to, payments made pursuant to the Royalty Agreement, the Archer Shares and the '346 patent.

### COUNT V – UNJUST ENRICHMENT (Against All Defendants)

99.     Paragraphs 1-98 above are incorporated by reference as if fully set forth herein.

100.    Plaintiffs conferred a benefit on Defendants by, among other things, making payments to them pursuant to the Royalty Agreement, transferring the Archer Shares to them, and assigning the '346 patent in accordance with the Royalty Agreement.

101.    The Royalty Agreement pursuant to which Plaintiffs conferred such benefits upon Defendants was fraudulently induced by Defendants' misrepresentations.

102.    Defendants did not hold any valid interest in the Patents Plaintiffs licensed under the Royalty Agreement, and thus Plaintiffs received nothing of value from Defendants.

103.    Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them without requiring Defendants to pay Plaintiffs for such benefits.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants, and that the Court award Plaintiffs the following relief:

(a)     judgment in favor of the Plaintiffs and against Defendants for compensatory damages in excess of $50,000.00;

17

Case ID: 140402014

  (b)  judgment in favor of the Plaintiffs and against the Defendants for punitive damages in the amount to be determined by the jury;

  (c)  judgment declaring that Plaintiffs are entitled to rescission of the Royalty Agreement;

  (d)  imposition of a constructive trust upon the Archer Shares and the '346 patent;

  (e)  prejudgment interest, reasonable attorneys' fees, and costs; and

  (f)  such other and further relief as the Court deems just.

       KAUFMAN, COREN & RESS, P.C.

       STEVEN M. COREN, ESQUIRE
       MATTHEW R. WILLIAMS, ESQUIRE
       DAVID M. DeVITO, ESQUIRE
       PA Attorney ID Nos. 32140; 91820; 310622
       Two Commerce Square
       2001 Market Street, Suite 3900
       Philadelphia, PA 19103
       215-735-8700

Dated: June 9, 2015     *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Matthew R. Williams, Esquire, do hereby certify that on, June 9, 2015, I caused a true and correct copy of the foregoing Complaint to be served by email and First-Class Mail, postage prepaid, upon the following:

> Peter C. Buckley, Esquire
> FOX ROTHSCHILD LLP
> 2000 Market Street, 20111 Floor
> Philadelphia, PA 19103
> pbuckley@foxrothschild.com
> *Attorneys for Defendants*

_____
Matthew R. Williams

Case ID: 140402014

By:  Steven M. Coren, Esquire
     Matthew R. Williams, Esquire
     David M. DeVito, Esquire
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700



                                                        Attorneys for Plaintiffs

| | |
|---|---|
| **THE ROSKAMP INSTITUTE, INC., et al.** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| **Plaintiffs,** | **APRIL TERM 2014** |
| **v.** | |
| **ALZHEIMER'S INSTITUTE OF AMERICA, INC., et al.,** | **Civil Action No. 02014** |
| **Defendants.** | |

<u>**PRAECIPE TO ATTACH**</u>

TO THE PROTHONOTARY:

     Kindly attach the Verification of Robert Roskamp to Plaintiffs' Complaint (E-Filing

#1506019392).

                              KAUFMAN, COREN & RESS, P.C.

                              Steven M. Coren, Esquire
                              Matthew R. Williams, Esquire
                              David M. DeVito, Esquire
                              Attorney ID Nos. 32140; 91820; 310622
                              Two Commerce Square, Suite 3900
                              2001 Market Street
                              Philadelphia, PA 19103
                              scoren@kcr-law.com
                              mwilliams@kcr-law.com
                              ddevito@kcr-law.com
Dated: June 10, 2015          (215) 735-8700


                                                        Case ID: 140402014

## VERIFICATION

I, Robert Roskamp, Chairman of the Board of Directors of The Roskamp Institute, Inc. and Archer Pharmaceuticals, Inc., hereby certify that I am authorized to make this verification on behalf of Plaintiffs The Roskamp Institute, Inc., Archer Pharmaceuticals, Inc., and Robert Roskamp, and verify that the averments of fact contained in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Dated: June 4, 2015

Robert Roskamp

KIMBERLY DONAGHY
MY COMMISSION # FF 11038
EXPIRES: June 23, 2017
Bonded Thru Notary Public Underwriters

Case ID: 140402014

**CERTIFICATE OF SERVICE**

I, Matthew R. Williams, Esquire, do hereby certify that on, June 10, 2015, I caused a true and correct copy of the foregoing Praecipe to Attach to be served by email and First-Class Mail, postage prepaid, upon the following:

> Peter C. Buckley, Esquire
> FOX ROTHSCHILD LLP
> 2000 Market Street, 20th Floor
> Philadelphia, PA 19103
> pbuckley@foxrothschild.com
> *Attorneys for Defendants*

Matthew R. Williams

Case ID: 140402014

PHILADELPHIA COURT OF COMMON PLEAS
**PETITION/MOTION COVER SHEET**

| FOR COURT USE ONLY | |
|---|---|
| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE:<br>07/15/2015 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response.*
*Status may be obtained online at http://courts.phila.gov*

**CONTROL NUMBER:**

15063384

*(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)*

April Term, 2014
*Month*                            *Year*
No. ........................... 02014

Name of Filing Party:

<u>THE ROSKAMP INSTITUTE, INC. ETAL VS
ALZHEIMER'S IN</u>

<u>ARCHER PHARMACEUTICALS, INC.-PLF</u>
<u>ROBERT ROSKAMP-PLF</u>
<u>THE ROSKAMP INSTITUTE, INC.-PLF</u>

**INDICATE NATURE OF DOCUMENT FILED:**
- ☐ Petition *(Attach Rule to Show Cause)*  ☒ Motion
- ☐ Answer to Petition      ☐ Response to Motion

Has another petition/motion been decided in this case?  ☐ Yes  ☒ No
Is another petition/motion pending?  ☐ Yes  ☒ No

*If the answer to either question is yes, you must identify the judge(s):*

| TYPE OF PETITION/MOTION *(see list on reverse side)*<br>MOTION TO AMEND | PETITION/MOTION CODE<br>*(see list on reverse side)*<br>MTAMD |
|---|---|

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

| I.  CASE PROGRAM<br><br>COMMERCE PROGRAM<br><br>Name of Judicial Team Leader: <u>JUDGE GARY GLAZER</u><br>Applicable Petition/Motion Deadline: <u>11/16/2015</u><br>Has deadline been previously extended by the Court: <u>NO</u> | II.  PARTIES *(required for proof of service)*<br>(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)<br>ANDREW J BELLI<br>  KAUFMAN, COREN & RESS, P.C. TWO<br>  COMMERCE SQUARE 2001 MARKET STREET,<br>  SUITE 3900 , PHILADELPHIA PA 19103<br>PETER C BUCKLEY<br>  2000 MARKET ST 20TH FLR ,<br>  PHILADELPHIA PA 19103-3291 |

III.  OTHER

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

June 25, 2015      MATTHEW R. WILLIAMS

*(Attorney Signature/Unrepresented Party)*      *(Date)*      *(Print Name)*      *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 1506055850
25-JUN-15 15:58:12

FILED
25 JUN 2015 03:38 pm
Civil Administration
E. MASCUILLI

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC., ARCHER PHARMACEUTICALS, INC., and ROBERT ROSKAMP, | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| **Plaintiffs,** | |
| v. | APRIL TERM, 2014 |
| | Civil Action No.: 02014 |
| ALZHEIMER'S INSTITUTE OF AMERICA, INC., ALZHEIMER'S INSTITUTE OF AMERICA FOUNDATION, INC., and RONALD SEXTON, | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## ORDER

AND NOW, this ___ day of _____, 2015, upon consideration of the Motion of Plaintiffs The Roskamp Institute, Inc., Archer Pharmaceuticals, Inc. and Robert Roskamp for Leave to File Amended Complaint, it is hereby ORDERED AND DECREED that the Motion is GRANTED, and Plaintiffs are granted leave to file the proposed Amended Complaint.

SO ORDERED:

_____
                                          J.

Case ID: 140402014
Control No.: 15063384

By:  STEVEN M. COREN, ESQUIRE
     MATTHEW R. WILLIAMS, ESQUIRE
     DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                                    **Attorneys for Plaintiffs**

---

| | |
|---|---|
| **THE ROSKAMP INSTITUTE, INC.,** **ARCHER PHARMACEUTICALS, INC.,** **and ROBERT ROSKAMP,** | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| **Plaintiffs,** | **APRIL TERM, 2014** |
| v. | **Civil Action No.: 02014** |
| **ALZHEIMER'S INSTITUTE OF** **AMERICA, INC., ALZHEIMER'S** **INSTITUTE OF AMERICA** **FOUNDATION, INC., and RONALD** **SEXTON,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

---

## <u>PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>

Plaintiffs The Roskamp Institute, Inc. ("Roskamp Institute"), Archer Pharmaceuticals,
Inc. ("Archer") and Robert Roskamp ("Roskamp" and, together with Roskamp Institute and
Archer, collectively, the "Plaintiffs"), by and through their attorneys, hereby move for leave to
file an Amended Complaint.  In support of their Motion, Plaintiffs state the following:

1.      On April 18, 2014, Plaintiffs initiated this action by Writ of Summons.

2.      On June 9, 2015, Plaintiffs filed a Complaint.  A true and correct copy of the
Complaint is attached hereto as Exhibit A.

1

3.    Plaintiffs wish to file an Amended Complaint to amplify and provide additional factual detail regarding their existing claims against Defendant Alzheimer's Institute of America Foundation, Inc.

4.    Defendants have not filed an answer or preliminary objections to Plaintiffs' original Complaint.

5.    Rule 1033 of the Pennsylvania Rules of Civil Procedure permits a party to amend its complaint either by filed consent of the adverse party or by leave of court. Pa. R.C.P. 1033.

6.    The rule also provides that "[t]he amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense." *Id.*

7.    The trial court has broad discretion in determining whether to allow amendment. *Capobianchi v. BIC Corp.*, 446 Pa. Super. 130, 666 A.2d 344, 346 (1995).

8.    "Amendments are to be liberally permitted except where surprise or prejudice to the other party will result, or where the amendment is against a positive rule of law." *Burger v. Borough of Ingram*, 697 A.2d 1037, 1041 (Pa. Commw. 1997); *Roach v. Port Auth. of Allegheny County*, 380 Pa. Super. 28, 30, 550 A.2d 1346, 1347 (1988) ("the right to amend the pleadings should not be withheld where some reasonable possibility exists that the amendment can be accomplished successfully.").

9.    As Defendants have not filed a responsive pleading and Plaintiffs' proposed amendment merely amplifies their existing claims through more detailed factual averments, Plaintiffs should be permitted to file the Amended Complaint attached hereto as Exhibit B.

Case ID: 140402014
Control No.: 15063384

10.     WHEREFORE, and for the reasons set forth in the accompanying Memorandum of Law, Plaintiffs respectfully request the entry of an Order granting their Motion and granting leave to file the proposed Amended Complaint.


KAUFMAN, COREN & RESS, P.C.


STEVEN M. COREN, ESQUIRE
MATTHEW R. WILLIAMS, ESQUIRE
DAVID M. DeVITO, ESQUIRE
PA Attorney ID Nos. 32140; 91820; 310622
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
215-735-8700

Dated: June 25, 2015                    *Attorneys for Plaintiffs*

3

Case ID: 140402014
Control No.: 15063384

By:  STEVEN M. COREN, ESQUIRE
     MATTHEW R. WILLIAMS, ESQUIRE
     DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                          **Attorneys for Plaintiffs**

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC.,<br>ARCHER PHARMACEUTICALS, INC.,<br>and ROBERT ROSKAMP,<br><br>Plaintiffs,<br><br>v.<br><br>ALZHEIMER'S INSTITUTE OF<br>AMERICA, INC., ALZHEIMER'S<br>INSTITUTE OF AMERICA<br>FOUNDATION, INC., and RONALD<br>SEXTON,<br><br>Defendants. | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY**<br><br>**APRIL TERM, 2014**<br><br>Civil Action No.: 02014<br><br><u>**JURY TRIAL DEMANDED**</u> |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
<u>LEAVE TO FILE AMENDED COMPLAINT</u>**

Plaintiffs The Roskamp Institute, Inc. ("Roskamp Institute"), Archer

Pharmaceuticals, Inc. ("Archer") and Robert Roskamp ("Roskamp" and, together with Roskamp

Institute and Archer, collectively, the "Plaintiffs"), by and through their attorneys, submit the

instant memorandum in support of their Motion for Leave to File Amended Complaint in the

instant action.

1

Case ID: 140402014
Control No.: 15063384

**Question Involved**

Should the Court grant Plaintiffs leave to file an amended complaint where the proposed amendment consists of additional facts which amplify and more particularly describe the wrongs already alleged in the original complaint and the Defendants' roles with respect thereto?

Suggested answer: Yes.

**Facts**

Plaintiffs seek in this action to recover the damages they have suffered and property they lost as a result of a deal Defendants fraudulently induced them to sign in exchange for the worthless right to use patents the Defendants falsely claimed to own.

On April 18, 2014, Plaintiffs initiated this action by Writ of Summons. On June 9, 2015, Plaintiffs filed the original Complaint. A true and correct copy of the original Complaint is attached hereto as Exhibit A. Defendants have not answered or filed preliminary objections to the original Complaint.

Plaintiffs wish to amend their Complaint to include facts which amplify and more particularly describe the wrongs alleged in the original Complaint. A true and correct copy of the proposed Amended Complaint is attached hereto was Exhibit B.

**Argument**

Rule 1033 of the Pennsylvania Rules of Civil Procedure permits a party to amend its complaint either by filed consent of the adverse party or by leave of court. Pa. R.C.P. 1033. The rule also provides that "[t]he amended pleading may aver transactions or occurrences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action or defense." *Id.*

2

The trial court has broad discretion in determining whether to allow amendment.

*Capobianchi v. BIC Corp.*, 446 Pa. Super. 130, 666 A.2d 344, 346 (1995). "Amendments are to

be liberally permitted except where surprise or prejudice to the other party will result, or where

the amendment is against a positive rule of law." *Burger v. Borough of Ingram*, 697 A.2d 1037,

1041 (Pa. Commw. 1997); *Roach v. Port Auth. of Allegheny County*, 380 Pa. Super. 28, 30, 550

A.2d 1346, 1347 (1988) ("the right to amend the pleadings should not be withheld where some

reasonable possibility exists that the amendment can be accomplished successfully.").

As Defendants have not filed a responsive pleading and Plaintiffs' proposed amendment

merely amplifies their existing claims through more detailed factual averments, Plaintiffs should

be permitted to file the Amended Complaint.

**Conclusion**

Based on the foregoing facts and authorities, Plaintiffs respectfully submit that their

Motion for Leave to File Amended Complaint should be granted.

KAUFMAN, COREN & RESS, P.C.

STEVEN M. COREN, ESQUIRE
MATTHEW R. WILLIAMS, ESQUIRE
DAVID M. DeVITO, ESQUIRE
PA Attorney ID Nos. 32140; 91820; 310622
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
215-735-8700

Dated: June 25, 2015          *Attorneys for Plaintiffs*

3

# EXHIBIT A

Case ID: 140402014
Control No.: 15063384

By:  STEVEN M. COREN, ESQUIRE
     MATTHEW R. WILLIAMS, ESQUIRE
     DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                    **Attorneys for Plaintiffs**

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC., ARCHER PHARMACEUTICALS, INC., and ROBERT ROSKAMP,<br><br>       Plaintiffs,<br><br>       v.<br><br>ALZHEIMER'S INSTITUTE OF AMERICA, INC., ALZHEIMER'S INSTITUTE OF AMERICA FOUNDATION, INC., and RONALD SEXTON,<br><br>       Defendants. | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br><br>**APRIL TERM, 2014**<br><br>**Civil Action No.: 02014**<br><br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION – COMPLAINT**

## NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHETHER YOU CAN GET LEGAL HELP.

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, Pa 19107
Telephone: (215) 238-1701

## AVISO

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Asociacion de Licenciados de Filadelfia
Servicio de Referencia e Informacion Legal
One Reading Center
Filadelfia, PA 19107
Telefono: (215) 238-1701

Case ID: 140402014

Control No.: 15063384

By:  STEVEN M. COREN, ESQUIRE
     MATTHEW R. WILLIAMS, ESQUIRE
     DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                                     **Attorneys for Plaintiffs**

---

| | |
|---|---|
| THE ROSKAMP INSTITUTE, INC.,<br>ARCHER PHARMACEUTICALS, INC.,<br>and ROBERT ROSKAMP,<br><br>Plaintiffs,<br><br>v.<br><br>ALZHEIMER'S INSTITUTE OF<br>AMERICA, INC., ALZHEIMER'S<br>INSTITUTE OF AMERICA<br>FOUNDATION, INC., and RONALD<br>SEXTON,<br><br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br><br>APRIL TERM, 2014<br><br>Civil Action No.: 02014<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

Plaintiffs The Roskamp Institute, Inc. ("Roskamp Institute"), Archer Pharmaceuticals,

Inc. ("Archer") and Robert Roskamp ("Roskamp" and, together with Roskamp Institute and

Archer, collectively, the "Plaintiffs"), by and through their attorneys, file this Complaint and

hereby assert causes of action for fraud, aiding and abetting fraud, civil conspiracy, failure of

consideration and unjust enrichment against Defendants Alzheimer's Institute of America, Inc.

("AIA"), Alzheimer's Institute of America Foundation, Inc. ("AIA Foundation") and Ronald

1

Sexton ("Sexton" and, together with AIA and AIA Foundation, collectively, the "Defendants"), as follows:

## INTRODUCTION

1.      Plaintiff Roskamp Institute is a non-profit entity devoted to Alzheimer's Disease research; plaintiff Archer is a for-profit company that develops and commercializes drug treatments for Alzheimer's that grow out of Roskamp Institute's research; and plaintiff Roskamp is a businessman and philanthropist who invests in and pays for the activities of Roskamp Institute and Archer with his personal funds and holds significant ownership stakes in both companies.

2.      In performing their work, Roskamp Institute and Archer build on decades of knowledge they and other leaders in the field have developed regarding Alzheimer's Disease. This involves, among other things, performing testing on laboratory animals that contain a certain genetic mutation linked to Alzheimer's known as the Swedish Mutation, which was first discovered in the early 1990s.

3.      Defendants AIA and AIA Foundation purport to own certain patents covering the Swedish Mutation and certain types of transgenic animals that carry it.

4.      Based on Defendants' purported ownership of these patent rights, Plaintiffs entered into a Royalty Agreement with AIA in 2008, pursuant to which Plaintiffs agreed to pay Defendants millions of dollars and hand over a 25% equity interest in Archer. In addition, the Royalty Agreement required Plaintiffs to surrender to AIA the rights to any discovery Plaintiffs made in the future while using Defendants' alleged patents.

2

5.     Plaintiffs have since made valuable scientific discoveries, including one that led to the issuance of a patent for a promising Alzheimer's drug treatment, which is now in advanced stages of development and regulatory approval.  Under their deal with Defendants, Plaintiffs were obligated to, and did, assign these rights to AIA.

6.     In turns out, however, that AIA's claims of patent ownership are part of an elaborate sham.  AIA conducts no research and sells no products.  It is, however, a serial litigant and shakedown artist.  In addition to bilking Plaintiffs out of their money, their Archer Shares, and their valuable patent rights, AIA has brought lawsuits accusing deep-pocketed defendants across the United States of infringing the same alleged patents.

7.     Though many targets of AIA's patent lawsuits elected to settle rather than spend millions of dollars fighting the charges, some resisted.  In a lawsuit AIA filed in the Eastern District of Pennsylvania in 2010, defendants Avid Radiopharmaceuticals and the University of Pennsylvania challenged AIA's standing on the grounds that AIA lacked the right to assert the patents it claimed to own.

8.     In 2012, a lengthy jury trial in the Eastern District exposed a sordid tale of fraud and deception by the scientists responsible for discovering the Swedish Mutation, who, with the help and encouragement of defendant Sexton, conspired to avoid the legitimate ownership claims of other entities and enrich themselves by concentrating the patent rights in AIA.

9.     Based on the revelations at trial, it is now clear that AIA procured its purported rights to the Swedish Mutation patents through fraudulent and illegal conduct and, as a result, has no legitimate interest in those patents as a matter of law.

10.     Consequently, it is equally clear that the Royalty Agreement, too, was a product of Defendants' fraud.  Accordingly, Plaintiffs bring this action to recover the damages they have

3

suffered and property they lost as a result of the deal Defendants fraudulently induced them to sign in exchange for the worthless right to use patents the Defendants falsely claimed to own.

## PARTIES

### The Plaintiffs

11.     Plaintiff Roskamp Institute is a corporation organized under laws of Florida with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

12.     Plaintiff Archer Pharmaceuticals is a corporation organized under the laws of Delaware with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

13.     Plaintiff Robert Roskamp is an individual resident of Florida with an address at 420 Golden Gate Point, PH 900, Sarasota, FL 34236.  Roskamp is the Chairman of the boards of directors of Roskamp Institute and Archer.

### The Defendants

14.     Defendant AIA is a corporation organized under the laws of Florida with a place of business at 7837 Parallel Parkway, Kansas City, KS 66112.

15.     Defendant AIA Foundation is a corporation organized under the laws of Delaware with a place of business at Office 211 North Broadway, Suite 3600, St. Louis, MO 63102.

16.     Defendant Ronald Sexton is an individual resident of Kansas with an address at 2900 Verona Road, Mission Hills, KS 66208.  On information and belief, Sexton is the majority owner and controlling shareholder of AIA and AIA Foundation.

17.     On information and belief, AIA and AIA Foundation are mere alter egos of Sexton.

4

Case ID: 140402014
Control No.: 15063384

## JURISDICTION AND VENUE

18.    This Court has personal jurisdiction over the Defendant pursuant to 42 Pa.C.S. § 5322 because, *inter alia*: (a) the Defendants, with the purpose of realizing a pecuniary interest therefrom, performed acts in Pennsylvania that are the subject of this Complaint; and (b) the Defendants expressly consented in writing to jurisdiction in Pennsylvania.

19.    Venue is proper in this Court pursuant to 42 Pa.C.S. § 931(c) and Pennsylvania Rules of Civil Procedure 1006 and 2179 because the Defendants expressly consented in writing to venue in courts located in Philadelphia.

## FACTUAL BACKGROUND

20.    Roskamp Institute is a non-profit research institution devoted to understanding the causes of and finding potential therapies for Alzheimer's Disease ("AD") and other neuro-degenerative disorders.

21.    Archer is a for-profit corporation focused on the commercial development of drug treatments for AD.

22.    AIA does not conduct any research or make any products, but purports to own certain patents and intellectual property rights relating to a genetic variation known as the Swedish Mutation, which is believed to cause AD.

23.    AIA's purported intellectual property rights included patents covering nucleic acids coding for the Swedish Mutation, U.S. Patent Number 5,455,169 (the "'169 patent"); transgenic mice carrying the Swedish Mutation, U.S. Patent Number 7,538,258 (the "'258 patent"); and certain other patents and intellectual property rights related thereto (collectively, the "Patents").

5

24.    Dr. Michael Mullan ("Mullan") is identified on both the '169 patent and the '258 patent as the sole inventor.

### Hardy's Team Discovers the London Mutation While Working at Imperial College

25.    Dr. John Hardy ("Hardy") began studying AD in 1979.  In 1985, he moved to St. Mary's Hospital Medical School in London, which later merged with Imperial College, where he started an AD laboratory and research program.

26.    Hardy was at all times the principal investigator and held overall responsibility for the lab at Imperial College.  Hardy eventually hired scientists from varied disciplines to work in his lab.  In approximately October 1988, Mullan joined Hardy's lab as a research fellow and Ph.D. student under Hardy.

27.    In 1990, Hardy, along with several Dutch scientists, wrote a paper describing a link between the amyloid precursor protein ("APP") and a disease called HCHWA-D, which, like AD, is characterized by the presence of amyloid deposits in the brain.  This paper concluded that a mutation in the APP gene was responsible for HCHWA-D.  This genetic mutation came to be known as the "Dutch Mutation."

28.    After discovering the Dutch Mutation, Hardy and his team began searching for APP mutations relating to AD by analyzing exons 16 and 17 of the APP gene taken from a British family.  This led to the discovery of the first genetic mutation associated with AD, a change in codon 717 of the APP gene, which came to be known as the "London Mutation."

29.    In January 1991, a patent application was filed for the London Mutation in the United Kingdom.  The application named Hardy, Mullan and three others as co-inventors.

6

30.     Under the U.K. Patent Act of 1977, which provides that inventions made by employees in the course of their normal duties belong to the employer, the rights to the London Mutation invention were owned by Imperial College.

31.     The London Mutation inventors also suggested patenting transgenic animals carrying the mutation, but were advised by Imperial College's technology transfer arm, Imperial Exploitation Limited ("IMPEL"), that transgenic animals were not patentable under U.K. law. IMPEL's advice, however, turned out to be erroneous.

32.     In February 1991, a company called Athena Neurosciences, Inc. ("Athena") approached Imperial College, through Hardy, with a proposal to sponsor his team's research. On August 1, 1991, Imperial College, IMPEL and Athena executed a Sponsored Research Agreement (the "Athena Agreement"). In connection therewith, upon noticing IMPEL's error, Athena revised the U.K. patent application to cover transgenic animals with the London Mutation.

33.     Pursuant to the Athena Agreement, Athena received the exclusive rights to transgenic animals with the London Mutation, as well as any AD discoveries from Hardy's lab at Imperial College.

### Sexton, Mullan and Hardy Conspire to Avoid the Athena Agreement

34.     Upon learning that IMPEL had given them erroneous advice, and believing that the rights relating to their discovery of the London mutation had been undervalued, Hardy and his team became disappointed with the Athena Agreement.

35.     At this time, Sexton, a businessman from Kansas City with no experience in scientific research arrived on the scene. Sexton saw a business opportunity in the Hardy team's research, and he furthered the perception that the Athena Agreement was a bad deal.

7

36.     Sexton suggested to Hardy and Mullan that he could offer them a deal that was much better than the Athena Agreement, and he successfully persuaded them to sign an agreement giving Sexton's company, Euroinvest Limited ("Euroinvest"), exclusive rights in their research.

37.     To effectuate the new deal with Sexton, however, they first needed to undo the Athena Agreement. In furtherance of that goal, and aided by Sexton and Clyde & Co. (a London law firm Sexton hired for the purpose), Hardy and Mullan made several attempts to challenge Imperial College's claim to the London Mutation patent.

38.     When Imperial College rejected their initial attempts, Mullan, Hardy and Dr. Alison Goate (at the time a junior scientist on Hardy's team) wrote a letter to Imperial College in which they claimed that Mullan had conceived the London Mutation before he became employed at Imperial College, and therefore the college had no rights to the invention.

39.     Imperial College, however, remained unswayed and rejected the claim that Mullan had made the invention before coming to the college.

40.     As Hardy and Goate would later testify, the allegations they made in the letter to Imperial College regarding Mullan's role in the discovery of the London Mutation were false. Goate testified that she engaged in this "scheme to cheat Imperial" because she felt pressure from Hardy, Mullan and Sexton.

41.     Unable to get out of the Athena Agreement and seeking to avoid Athena's option on any new APP mutations, the scientists on Hardy's team (along with Sexton) agreed they would not identify any additional mutations while working at Imperial College.

8

Case ID: 140402014
Control No.: 15063384

42.     To continue the work while avoiding making any further discoveries at Imperial College, Hardy decided to move his laboratory from Imperial College to the University of South Florida ("USF").

43.     At Hardy's request, USF hired Mullan as a research assistant in Hardy's laboratory.  Mullan arrived at USF in December 1991 and began work setting up Hardy's lab. Hardy, meanwhile, remained at Imperial College until May 1992, waiting for the new lab to be constructed at USF.

<u>Hardy and His Team Discover the Swedish Mutation and Conspire to Ensure that Neither Imperial College Nor USF Acquire Any Rights in the Invention</u>

44.     In early 1992, a team of researchers at the Karolinska Institute in Sweden collected DNA samples from Swedish families with AD.  In February 1992, a Swedish scientist visited Hardy at Imperial College and delivered DNA samples from several of the Swedish families.

45.     Hardy decided to conduct genetic studies on two of the Swedish families, referred to as "F139" and "F144."  Hardy asked a lab technician at Imperial College, Henry Houlden, to conduct a "GT12 analysis" on the DNA from the two families.

46.     Houlden performed the analysis over several weeks and provided the results to Hardy in London.  Hardy analyzed the data from Houlden's analysis and concluded that it suggested a strong likelihood of mutation on the APP gene in both families.

47.     To prevent Imperial College and Athena from obtaining any rights to the new mutation, Hardy instructed Houlden to send selected DNA samples from the two families to Mullan to have them sequenced in Florida.

9

48.     Although Mullan lacked the ability to sequence the DNA on his own, Hardy knew that Fiona Crawford (like Mullan, then a Ph.D. student who worked on Hardy's team at Imperial College), who had experience in DNA sequencing, would soon arrive in Florida.

49.     Upon her arrival, Crawford sequenced the DNA samples sent by Hardy at the Tampa Bay Research Institute (which was, notably, off-campus from USF).

50.     Crawford's sequencing revealed that the DNA of the affected Swedish family members did in fact contain a double mutation in exon 16 at codons 670 and 671. This discovery became known as the "Swedish Mutation."

51.     In late April 1992, work immediately began on a patent application for the newly-discovered Swedish mutation, as well as a publication describing the discovery, which would ultimately be published in *Nature Genetics*.

52.     Upon discovering the Swedish mutation, Hardy and Mullan, with the help of Sexton and his attorneys, resolved to ensure that neither Imperial College nor USF would obtain any rights to the invention.

53.     In furtherance of their plan, Mullan and Hardy agreed that Hardy's name would not appear on any patent application or publication regarding their discovery of the Swedish Mutation. They made this decision because, at the time of the discovery, Hardy was still an employee of Imperial College subject to the Athena Agreement. Thus, leaving Hardy's name off of the invention served to prevent Imperial College or Athena from obtaining rights to the invention.

10

Case ID: 140402014
Control No.: 15063384

54.     Hardy and Mullan also knew, however, that under USF's regulations and Florida law, USF would have rights to the Swedish Mutation discovery because Mullan was a USF employee.

55.     To solve the USF problem, Hardy, Mullan and Sexton devised a plan to have USF waive its rights to the Swedish Mutation.

56.     To accomplish this, Sexton's lawyers sent USF a letter describing the work Hardy and Mullan had done on the London Mutation and their resulting dispute with Imperial College over the rights to that invention. Notably, the letter did not disclose the discovery of the Swedish Mutation or any information about the work that had been done in Florida.

57.     Dr. George Newkome, USF's Vice President for Research interpreted the letter as requesting USF's confirmation that the university would not assert rights in Hardy's and Mullan's London Mutation research. As prepared by Sexton's lawyers, the letter asked USF to agree that "all ownership of rights in any work carried out by [Hardy and Mullan] and inventions made by them (whether before or after the date of this letter) belong exclusively to Hardy and Mullan."

58.     Having been advised of the scientists' dispute with Imperial College, Newkome wished to draw a clear line between research belonging to Imperial College and research at USF. Newkome met with Hardy, Mullan and Sexton to discuss the letter, but was never told about the discovery of the Swedish Mutation. In fact, Newkome was affirmatively told that because the new lab being built for Hardy's team at USF had yet to be completed, "there was really nothing new going on."

11

Case ID: 140402014
Control No.: 15063384

59.     At the meeting, based on the representations made by Hardy, Mullan and Sexton, Newkome revised the letter to provide that USF would agree that any work done or inventions made by Hardy and Mullan prior to August 15, 1992 (the start of the upcoming semester at USF, Hardy's first) would belong to Hardy and Mullan.  On May 4, 1992, Newkome signed the letter as revised.

### In Furtherance of the Scheme, the Rights to the Swedish Mutation Are Assigned to AIA

60.     After successfully tricking USF into ostensibly waiving its rights to the Swedish Mutation, Sexton incorporated AIA the next day, May 5, 1992.

61.     The patent application for the Swedish Mutation, listing Mullan as the sole inventor, was filed on June 4, 1992.

62.     Mullan assigned all of his rights in the Swedish Mutation invention to AIA on July 15, 1992.

### AIA Fraudulently Induces Roskamp Institute and Archer to Enter into the Royalty Agreement Concerning the Use of AIA's Patents

63.     Believing AIA to be the rightful owner of the Patents and wishing to use the Patents in their research and development activities, Roskamp and Archer engaged in negotiations with AIA concerning the use of the Patents.

64.     In or about February 2008, Roskamp, Archer and AIA entered into a contract dated as of February 7, 2008 (the "Effective Date") entitled Agreement for Consideration and Royalty Payments Paid to Alzheimer's Institute of America, Inc. (the "Royalty Agreement").

Case ID: 140402014
Control No.: 15063384

65.   The Royalty Agreement provides that it is governed by the laws of Pennsylvania, and that all parties agree to submit to jurisdiction in the courts located in Philadelphia, Pennsylvania.

66.   Pursuant to the Royalty Agreement, Roskamp and Archer acquired a revocable, non-exclusive license to use the Patents.

67.   In return, Roskamp and Archer promised AIA the following: (a) payment of $1,000,000 upon execution of the Royalty Agreement, plus additional future payments totaling $11,750,000 linked to certain milestones; (b) twenty-five percent (25%) of the outstanding equity shares of Archer as of the Effective Date (the "Archer Shares"); and (c) assignment to AIA of their rights to any inventions discovered through the use of the Patents.

68.   Following execution of the Royalty Agreement, through the use of the Patents, Roskamp Institute scientists discovered that the drug Nilvadipene, originally developed to treat high blood pressure, could be used to treat AD.  Roskamp Institute obtained a patent on this discovery, U.S. Patent Number 8,236,346 (the "'346 patent"), which was assigned to AIA pursuant to the Royalty Agreement.

### Roskamp and Archer Learn AIA Has No Right to the Patents and Thus Procured the Royalty Agreement Through Fraud

69.   On November 24, 2010, AIA filed a lawsuit against Avid Radiopharmaceuticals, Inc. ("Avid") and the Trustees of the University of Pennsylvania ("Penn") in the United States District Court for the Eastern District of Pennsylvania (the "District Court"), Case No. 2:10-cv-06908 (the "Avid Action").

70.   In the Avid Action, AIA sought damages from Avid and Penn based on allegations that they had willfully infringed both the '169 patent and the '258 patent.

13

71.    The Avid Action was not the first such infringement lawsuit brought by AIA.  In fact, AIA had previously filed multiple lawsuits against other entities associated with AD research.  Many of the defendants in these cases chose not to fight AIA and settled, some paying AIA millions of dollars.

72.    Avid and Penn contested AIA's charges and sought dismissal of the Avid Action on the grounds that AIA lacked standing to assert its purported rights under the '169 and '258 patents.

73.    A trial was held regarding the issue of AIA's standing in the Spring 2012.  Hardy, Mullan, Goate, Houlden, Crawford and Newkome were among those that testified.

74.    After hearing the testimony, the jury found that (a) Mullan was not, in fact, the sole inventor of the '169 and '258 patents; (b) Hardy was at least a co-inventor of the '169 and '258 patents; and (c) USF, Mullan's employer at the time the application for the '169 patent was filed, did not knowingly and intentionally waive its rights to the invention.

75.    Accordingly, based on the jury's findings, the District Court concluded that AIA lacked standing to assert the '169 and '258 patents and entered judgment in favor of Avid and Penn.

76.    On May 16, 2014, the U.S. Court of Appeals for the Federal Circuit affirmed the District Court's judgment without opinion.

### COUNT I - FRAUD (Against AIA)

77.    Paragraphs 1-76 above are incorporated by reference as if fully set forth herein.

Case ID: 140402014
Control No.: 15063384

78.     By licensing the Patents to Roskamp Institute and Archer pursuant to the Royalty Agreement, AIA intentionally misrepresented to Plaintiffs that AIA held a valid interest in the Patents that would be subject to the license.

79.     AIA at all times knew that it had obtained title to the Patents wrongfully and through fraudulent means and in fact lacked rights in the Patents as a matter of law.

80.     AIA made these misrepresentations with the intention that they be relied upon by Plaintiffs in entering into the Royalty Agreement.

81.     AIA's misrepresentations were material to Plaintiffs' decision to enter into the Royalty Agreement, and but for AIA's misrepresentations, Plaintiffs would not have entered into the Royalty Agreement.

82.     Plaintiffs reasonably relied upon AIA's misrepresentations to their detriment in entering into the Royalty Agreement.

83.     AIA's misrepresentations caused Plaintiffs to enter into the Royalty Agreement, when they were otherwise under no duty to do so.

84.     As the direct, foreseeable, and proximate result of AIA's misrepresentations, Plaintiffs have suffered and continue to suffer damages, as aforesaid, for which they are entitled to recover against AIA.

## COUNT II - AIDING AND ABETTING FRAUD (Against Sexton)

85.     Paragraphs 1-84 above are incorporated by reference as if fully set forth herein.

86.     AIA committed the tort of fraud against Plaintiffs as described herein.

Case ID: 140402014
Control No.: 15063384

87.     Sexton knowingly and substantially assisted AIA's tortious conduct by, among other things, facilitating the conspiracy by which AIA fraudulently obtained title to the Patents by depriving Imperial College and USF of their rights thereto.

88.     Sexton was aware of his role as part of AIA's illegal and tortious activity at the time he provided the assistance.

89.     Plaintiffs have suffered and continued to suffer damages in an amount to be proven at trial as a result of the tortious conduct aided and abetted by Sexton.

## COUNT III - CIVIL CONSPIRACY (Against All Defendants)

90.     Paragraphs 1-89 above are incorporated by reference as if fully set forth herein.

91.     Defendants combined and conspired to commit the unlawful acts of fraud described herein.

92.     As described herein, AIA and Sexton created a plan to defraud Plaintiffs by falsely representing their ownership of the Patents to Plaintiffs to fraudulently induce Plaintiffs to enter into the Royalty Agreement.

93.     Sexton furthered AIA's unlawful plan by, among other things, facilitating the conspiracy by which AIA obtained purported title to the Swedish Mutation patents by fraudulently depriving Imperial College and USF of their rights.

94.     Defendants' actions in furtherance of the conspiracy injured Plaintiffs, causing Plaintiffs to suffer damages in an amount to be proved at trial.

## COUNT IV – FAILURE OF CONSIDERATION (Against AIA)

95.     Paragraphs 1-94 above are incorporated by reference as if fully set forth herein.

96.     AIA at all times lacked rights in the Patents as a matter of law.

16

Case ID: 140402014
Control No.: 15063384

97.     Because AIA lacked rights in the Patents, the consideration bargained for by Plaintiffs in the Royalty Agreement did not pass, in whole or in part, to Plaintiffs.

98.     As a result of the failure of consideration, the Royalty Agreement is invalid and void, and Plaintiffs are entitled to the return of any and all consideration paid or provided to AIA pursuant to the Royalty Agreement, including but not limited to, payments made pursuant to the Royalty Agreement, the Archer Shares and the '346 patent.

### COUNT V – UNJUST ENRICHMENT (Against All Defendants)

99.     Paragraphs 1-98 above are incorporated by reference as if fully set forth herein.

100.    Plaintiffs conferred a benefit on Defendants by, among other things, making payments to them pursuant to the Royalty Agreement, transferring the Archer Shares to them, and assigning the '346 patent in accordance with the Royalty Agreement.

101.    The Royalty Agreement pursuant to which Plaintiffs conferred such benefits upon Defendants was fraudulently induced by Defendants' misrepresentations.

102.    Defendants did not hold any valid interest in the Patents Plaintiffs licensed under the Royalty Agreement, and thus Plaintiffs received nothing of value from Defendants.

103.    Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them without requiring Defendants to pay Plaintiffs for such benefits.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants, and that the Court award Plaintiffs the following relief:

(a)     judgment in favor of the Plaintiffs and against Defendants for compensatory damages in excess of $50,000.00;

Case ID: 140402014

Control No.: 15063384

(b)     judgment in favor of the Plaintiffs and against the Defendants for punitive

damages in the amount to be determined by the jury;

       (c)     judgment declaring that Plaintiffs are entitled to rescission of the Royalty

              Agreement;

       (d)     imposition of a constructive trust upon the Archer Shares and the '346 patent;

       (e)     prejudgment interest, reasonable attorneys' fees, and costs; and

       (f)     such other and further relief as the Court deems just.

KAUFMAN, COREN & RESS, P.C.

STEVEN M. COREN, ESQUIRE
MATTHEW R. WILLIAMS, ESQUIRE
DAVID M. DeVITO, ESQUIRE
PA Attorney ID Nos. 32140; 91820; 310622
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
215-735-8700

Dated: June 9, 2015       *Attorneys for Plaintiffs*

18

## CERTIFICATE OF SERVICE

I, Matthew R. Williams, Esquire, do hereby certify that on, June 9, 2015, I caused a true and correct copy of the foregoing Complaint to be served by email and First-Class Mail, postage prepaid, upon the following:

> Peter C. Buckley, Esquire
> FOX ROTHSCHILD LLP
> 2000 Market Street, 20111 Floor
> Philadelphia, PA 19103
> pbuckley@foxrothschild.com
> *Attorneys for Defendants*

_____
Matthew R. Williams

Case ID: 140402014
Control No.: 15063384

# EXHIBIT B

Case ID: 140402014
Control No.: 15063384

By:  STEVEN M. COREN, ESQUIRE
     MATTHEW R. WILLIAMS, ESQUIRE
     DAVID M. DeVITO, ESQUIRE
Attorney ID Nos. 32140; 91820; 310622
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
mwilliams@kcr-law.com
ddevito@kcr-law.com
(215) 735-8700                              **Attorneys for Plaintiffs**

| | |
|---|---|
| **THE ROSKAMP INSTITUTE, INC.,**<br>**ARCHER PHARMACEUTICALS, INC.,**<br>**and ROBERT ROSKAMP,**<br><br>Plaintiffs,<br><br>v.<br><br>**ALZHEIMER'S INSTITUTE OF**<br>**AMERICA, INC., ALZHEIMER'S**<br>**INSTITUTE OF AMERICA**<br>**FOUNDATION, INC., and RONALD**<br>**SEXTON,**<br><br>Defendants. | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY**<br><br><br>**APRIL TERM, 2014**<br><br>Civil Action No.: 02014<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**AMENDED COMPLAINT**</u>

Plaintiffs The Roskamp Institute, Inc. ("Roskamp Institute"), Archer Pharmaceuticals,

Inc. ("Archer") and Robert Roskamp ("Roskamp" and, together with Roskamp Institute and

Archer, collectively, the "Plaintiffs"), by and through their attorneys, file this Amended

Complaint and hereby assert causes of action for fraud, aiding and abetting fraud, civil

conspiracy, failure of consideration and unjust enrichment against Defendants Alzheimer's

Institute of America, Inc. ("AIA"), Alzheimer's Institute of America Foundation, Inc. ("AIA

1

Foundation") and Ronald Sexton ("Sexton" and, together with AIA and AIA Foundation, collectively, the "Defendants"), as follows:

## INTRODUCTION

1.      Plaintiff Roskamp Institute is a non-profit entity devoted to Alzheimer's Disease research; plaintiff Archer is a for-profit company that develops and commercializes drug treatments for Alzheimer's that grow out of Roskamp Institute's research; and plaintiff Roskamp is a businessman and philanthropist who invests in and pays for the activities of Roskamp Institute and Archer with his personal funds and holds significant ownership stakes in both companies.

2.      In performing their work, Roskamp Institute and Archer build on decades of knowledge they and other leaders in the field have developed regarding Alzheimer's Disease. This involves, among other things, performing testing on laboratory animals that contain a certain genetic mutation linked to Alzheimer's known as the Swedish Mutation, which was first discovered in the early 1990s.

3.      Defendants AIA and AIA Foundation purport to own certain patents covering the Swedish Mutation and certain types of transgenic animals that carry it.

4.      Based on Defendants' purported ownership of these patent rights, Plaintiffs entered into a Royalty Agreement with AIA in 2008, pursuant to which Plaintiffs agreed to pay Defendants millions of dollars and hand over a 25% equity interest in Archer. In addition, the Royalty Agreement required Plaintiffs to surrender to AIA the rights to any discovery Plaintiffs made in the future while using Defendants' alleged patents.

2

Case ID: 140402014
Control No.: 15063384

5.     Plaintiffs have since made valuable scientific discoveries, including one that led to the issuance of a patent for a promising Alzheimer's drug treatment, which is now in advanced stages of development and regulatory approval.  Under their deal with Defendants, Plaintiffs were obligated to, and did, assign these rights to AIA.

6.     In turns out, however, that AIA's claims of patent ownership are part of an elaborate sham.  AIA conducts no research and sells no products.  It is, however, a serial litigant and shakedown artist.  In addition to bilking Plaintiffs out of their money, their Archer Shares, and their valuable patent rights, AIA has brought lawsuits accusing deep-pocketed defendants across the United States of infringing the same alleged patents.

7.     According to Sexton's own testimony, millions of dollars in settlement proceeds AIA obtained through its patent infringement shakedown lawsuits were funneled into AIA Foundation, which was set up as a tax-exempt haven for these ill-gotten gains.

8.     Though many targets of AIA's patent lawsuits elected to settle rather than spend millions of dollars fighting the charges, some resisted.  In a lawsuit AIA filed in the Eastern District of Pennsylvania in 2010, defendants Avid Radiopharmaceuticals and the University of Pennsylvania challenged AIA's standing on the grounds that AIA lacked the right to assert the patents it claimed to own.

9.     In 2012, a lengthy jury trial in the Eastern District exposed a sordid tale of fraud and deception by the scientists responsible for discovering the Swedish Mutation, who, with the help and encouragement of defendant Sexton, conspired to avoid the legitimate ownership claims of other entities and enrich themselves by concentrating the patent rights in AIA and funneling the shakedown proceeds into AIA Foundation.

3

Case ID: 140402014
Control No.: 15063384

10.   Based on the revelations at trial, it is now clear that AIA procured its purported rights to the Swedish Mutation patents through fraudulent and illegal conduct and, as a result, has no legitimate interest in those patents as a matter of law.

11.   Consequently, it is equally clear that the Royalty Agreement, too, was a product of Defendants' fraud. Accordingly, Plaintiffs bring this action to recover the damages they have suffered and property they lost as a result of the deal Defendants fraudulently induced them to sign in exchange for the worthless right to use patents the Defendants falsely claimed to own.

## PARTIES

### The Plaintiffs

12.   Plaintiff Roskamp Institute is a corporation organized under laws of Florida with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

13.   Plaintiff Archer Pharmaceuticals is a corporation organized under the laws of Delaware with a place of business at 2040 Whitfield Ave., Sarasota, FL 34243.

14.   Plaintiff Robert Roskamp is an individual resident of Florida with an address at 8105 Warwick Gardens Lane, University Park, FL 34201.  Roskamp is the Chairman of the boards of directors of Roskamp Institute and Archer.

### The Defendants

15.   At the time this action was commenced, Defendant AIA was a corporation organized under the laws of Florida with a place of business at 7837 Parallel Parkway, Kansas City, KS 66112.

16.   Defendant AIA Foundation is a corporation organized under the laws of Delaware with a place of business at Office 211 North Broadway, Suite 3600, St. Louis, MO 63102.

4

Case ID: 140402014
Control No.: 15063384

17.     Defendant Ronald Sexton is an individual resident of Kansas with an address at 2900 Verona Road, Mission Hills, KS 66208.  On information and belief, Sexton is the majority owner and controlling shareholder of AIA and AIA Foundation.

18.     On information and belief, AIA and AIA Foundation are mere alter egos of Sexton.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over the Defendant pursuant to 42 Pa.C.S. § 5322 because, *inter alia*: (a) the Defendants, with the purpose of realizing a pecuniary interest therefrom, performed acts in Pennsylvania that are the subject of this Complaint; and (b) the Defendants expressly consented in writing to jurisdiction in Pennsylvania.

20.     Venue is proper in this Court pursuant to 42 Pa.C.S. § 931(c) and Pennsylvania Rules of Civil Procedure 1006 and 2179 because the Defendants expressly consented in writing to venue in courts located in Philadelphia.

## FACTUAL BACKGROUND

21.     Roskamp Institute is a non-profit research institution devoted to understanding the causes of and finding potential therapies for Alzheimer's Disease ("AD") and other neuro-degenerative disorders.

22.     Archer is a for-profit corporation focused on the commercial development of drug treatments for AD.

23.     AIA does not conduct any research or make any products, but purports to own certain patents and intellectual property rights relating to a genetic variation known as the Swedish Mutation, which is believed to cause AD.

24.     AIA Foundation's Facebook page identifies it as a division of AIA.

5

25.     AIA Foundation's Facebook page also indicates that it shares the same address as Roskamp Institute and Archer at 2040 Whitfield Avenue in Sarasota, Florida, and its website identifies Roskamp Institute and Archer as "Partnering Organizations" of AIA Foundation.

26.     AIA's purported intellectual property rights included patents covering nucleic acids coding for the Swedish Mutation, U.S. Patent Number 5,455,169 (the "'169 patent"); transgenic mice carrying the Swedish Mutation, U.S. Patent Number 7,538,258 (the "'258 patent"); and certain other patents and intellectual property rights related thereto (collectively, the "Patents").

27.     Dr. Michael Mullan ("Mullan") is identified on both the '169 patent and the '258 patent as the sole inventor.

**Hardy's Team Discovers the London Mutation While Working at Imperial College**

28.     Dr. John Hardy ("Hardy") began studying AD in 1979.  In 1985, he moved to St. Mary's Hospital Medical School in London, which later merged with Imperial College, where he started an AD laboratory and research program.

29.     Hardy was at all times the principal investigator and held overall responsibility for the lab at Imperial College.  Hardy eventually hired scientists from varied disciplines to work in his lab.  In approximately October 1988, Mullan joined Hardy's lab as a research fellow and Ph.D. student under Hardy.

30.     In 1990, Hardy, along with several Dutch scientists, wrote a paper describing a link between the amyloid precursor protein ("APP") and a disease called HCHWA-D, which, like AD, is characterized by the presence of amyloid deposits in the brain.  This paper concluded that a mutation in the APP gene was responsible for HCHWA-D.  This genetic mutation came to be known as the "Dutch Mutation."

6

31.    After discovering the Dutch Mutation, Hardy and his team began searching for APP mutations relating to AD by analyzing exons 16 and 17 of the APP gene taken from a British family.  This led to the discovery of the first genetic mutation associated with AD, a change in codon 717 of the APP gene, which came to be known as the "London Mutation."

32.    In January 1991, a patent application was filed for the London Mutation in the United Kingdom.  The application named Hardy, Mullan and three others as co-inventors.

33.    Under the U.K. Patent Act of 1977, which provides that inventions made by employees in the course of their normal duties belong to the employer, the rights to the London Mutation invention were owned by Imperial College.

34.    The London Mutation inventors also suggested patenting transgenic animals carrying the mutation, but were advised by Imperial College's technology transfer arm, Imperial Exploitation Limited ("IMPEL"), that transgenic animals were not patentable under U.K. law. IMPEL's advice, however, turned out to be erroneous.

35.    In February 1991, a company called Athena Neurosciences, Inc. ("Athena") approached Imperial College, through Hardy, with a proposal to sponsor his team's research.  On August 1, 1991, Imperial College, IMPEL and Athena executed a Sponsored Research Agreement (the "Athena Agreement").  In connection therewith, upon noticing IMPEL's error, Athena revised the U.K. patent application to cover transgenic animals with the London Mutation.

36.    Pursuant to the Athena Agreement, Athena received the exclusive rights to transgenic animals with the London Mutation, as well as any AD discoveries from Hardy's lab at Imperial College.

## Sexton, Mullan and Hardy Conspire to Avoid the Athena Agreement

37.     Upon learning that IMPEL had given them erroneous advice, and believing that the rights relating to their discovery of the London mutation had been undervalued, Hardy and his team became disappointed with the Athena Agreement.

38.     At this time, Sexton, a businessman from Kansas City with no experience in scientific research arrived on the scene.  Sexton saw a business opportunity in the Hardy team's research, and he furthered the perception that the Athena Agreement was a bad deal.

39.     Sexton suggested to Hardy and Mullan that he could offer them a deal that was much better than the Athena Agreement, and he successfully persuaded them to sign an agreement giving Sexton's company, Euroinvest Limited ("Euroinvest"), exclusive rights in their research.

40.     To effectuate the new deal with Sexton, however, they first needed to undo the Athena Agreement.  In furtherance of that goal, and aided by Sexton and Clyde & Co. (a London law firm Sexton hired for the purpose), Hardy and Mullan made several attempts to challenge Imperial College's claim to the London Mutation patent.

41.     When Imperial College rejected their initial attempts, Mullan, Hardy and Dr. Alison Goate (at the time a junior scientist on Hardy's team) wrote a letter to Imperial College in which they claimed that Mullan had conceived the London Mutation before he became employed at Imperial College, and therefore the college had no rights to the invention.

42.     Imperial College, however, remained unswayed and rejected the claim that Mullan had made the invention before coming to the college.

43.     As Hardy and Goate would later testify, the allegations they made in the letter to Imperial College regarding Mullan's role in the discovery of the London Mutation were false.

8

Goate testified that she engaged in this "scheme to cheat Imperial" because she felt pressure from Hardy, Mullan and Sexton.

44.     Unable to get out of the Athena Agreement and seeking to avoid Athena's option on any new APP mutations, the scientists on Hardy's team (along with Sexton) agreed they would not identify any additional mutations while working at Imperial College.

45.     To continue the work while avoiding making any further discoveries at Imperial College, Hardy decided to move his laboratory from Imperial College to the University of South Florida ("USF").

46.     At Hardy's request, USF hired Mullan as a research assistant in Hardy's laboratory.  Mullan arrived at USF in December 1991 and began work setting up Hardy's lab.  Hardy, meanwhile, remained at Imperial College until May 1992, waiting for the new lab to be constructed at USF.

### Hardy and His Team Discover the Swedish Mutation and Conspire to Ensure that Neither Imperial College Nor USF Acquire Any Rights in the Invention

47.     In early 1992, a team of researchers at the Karolinska Institute in Sweden collected DNA samples from Swedish families with AD.  In February 1992, a Swedish scientist visited Hardy at Imperial College and delivered DNA samples from several of the Swedish families.

48.     Hardy decided to conduct genetic studies on two of the Swedish families, referred to as "F139" and "F144."  Hardy asked a lab technician at Imperial College, Henry Houlden, to conduct a "GT12 analysis" on the DNA from the two families.

9

49.     Houlden performed the analysis over several weeks and provided the results to Hardy in London.  Hardy analyzed the data from Houlden's analysis and concluded that it suggested a strong likelihood of mutation on the APP gene in both families.

50.     To prevent Imperial College and Athena from obtaining any rights to the new mutation, Hardy instructed Houlden to send selected DNA samples from the two families to Mullan to have them sequenced in Florida.

51.     Although Mullan lacked the ability to sequence the DNA on his own, Hardy knew that Fiona Crawford (like Mullan, then a Ph.D. student who worked on Hardy's team at Imperial College), who had experience in DNA sequencing, would soon arrive in Florida.

52.     Upon her arrival, Crawford sequenced the DNA samples sent by Hardy at the Tampa Bay Research Institute (which was, notably, off-campus from USF).

53.     Crawford's sequencing revealed that the DNA of the affected Swedish family members did in fact contain a double mutation in exon 16 at codons 670 and 671.  This discovery became known as the "Swedish Mutation."

54.     In late April 1992, work immediately began on a patent application for the newly-discovered Swedish mutation, as well as a publication describing the discovery, which would ultimately be published in *Nature Genetics*.

55.     Upon discovering the Swedish mutation, Hardy and Mullan, with the help of Sexton and his attorneys, resolved to ensure that neither Imperial College nor USF would obtain any rights to the invention.

56.     In furtherance of their plan, Mullan and Hardy agreed that Hardy's name would not appear on any patent application or publication regarding their discovery of the Swedish

10

Mutation. They made this decision because, at the time of the discovery, Hardy was still an employee of Imperial College subject to the Athena Agreement. Thus, leaving Hardy's name off of the invention served to prevent Imperial College or Athena from obtaining rights to the invention.

57.     Hardy and Mullan also knew, however, that under USF's regulations and Florida law, USF would have rights to the Swedish Mutation discovery because Mullan was a USF employee.

58.     To solve the USF problem, Hardy, Mullan and Sexton devised a plan to have USF waive its rights to the Swedish Mutation.

59.     To accomplish this, Sexton's lawyers sent USF a letter describing the work Hardy and Mullan had done on the London Mutation and their resulting dispute with Imperial College over the rights to that invention. Notably, the letter did not disclose the discovery of the Swedish Mutation or any information about the work that had been done in Florida.

60.     Dr. George Newkome, USF's Vice President for Research interpreted the letter as requesting USF's confirmation that the university would not assert rights in Hardy's and Mullan's London Mutation research. As prepared by Sexton's lawyers, the letter asked USF to agree that "all ownership of rights in any work carried out by [Hardy and Mullan] and inventions made by them (whether before or after the date of this letter) belong exclusively to Hardy and Mullan."

61.     Having been advised of the scientists' dispute with Imperial College, Newkome wished to draw a clear line between research belonging to Imperial College and research at USF. Newkome met with Hardy, Mullan and Sexton to discuss the letter, but was never told about the

11

discovery of the Swedish Mutation. In fact, Newkome was affirmatively told that because the new lab being built for Hardy's team at USF had yet to be completed, "there was really nothing new going on."

62. At the meeting, based on the representations made by Hardy, Mullan and Sexton, Newkome revised the letter to provide that USF would agree that any work done or inventions made by Hardy and Mullan prior to August 15, 1992 (the start of the upcoming semester at USF, Hardy's first) would belong to Hardy and Mullan. On May 4, 1992, Newkome signed the letter as revised.

**In Furtherance of the Scheme, the Rights to the Swedish Mutation Are Assigned to AIA**

63. After successfully tricking USF into ostensibly waiving its rights to the Swedish Mutation, Sexton incorporated AIA the next day, May 5, 1992.

64. The patent application for the Swedish Mutation, listing Mullan as the sole inventor, was filed on June 4, 1992.

65. Mullan assigned all of his rights in the Swedish Mutation invention to AIA on July 15, 1992.

**AIA Fraudulently Induces Roskamp Institute and Archer to Enter into the Royalty Agreement Concerning the Use of AIA's Patents**

66. Believing AIA to be the rightful owner of the Patents and wishing to use the Patents in their research and development activities, Roskamp and Archer engaged in negotiations with AIA concerning the use of the Patents.

12

67.     In or about February 2008, Roskamp, Archer and AIA entered into a contract dated as of February 7, 2008 (the "Effective Date") entitled Agreement for Consideration and Royalty Payments Paid to Alzheimer's Institute of America, Inc. (the "Royalty Agreement").

68.     The Royalty Agreement provides that it is governed by the laws of Pennsylvania, and that all parties agree to submit to jurisdiction in the courts located in Philadelphia, Pennsylvania.

69.     Pursuant to the Royalty Agreement, Roskamp and Archer acquired a revocable, non-exclusive license to use the Patents.

70.     In return, Roskamp and Archer promised AIA the following: (a) payment of $1,000,000 upon execution of the Royalty Agreement, plus additional future payments totaling $11,750,000 linked to certain milestones; (b) twenty-five percent (25%) of the outstanding equity shares of Archer as of the Effective Date (the "Archer Shares"); and (c) assignment to AIA of their rights to any inventions discovered through the use of the Patents.

71.     Following execution of the Royalty Agreement, through the use of the Patents, Roskamp Institute scientists discovered that the drug Nilvadipene, originally developed to treat high blood pressure, could be used to treat AD.  Roskamp Institute obtained a patent on this discovery, U.S. Patent Number 8,236,346 (the "'346 patent"), which was assigned to AIA pursuant to the Royalty Agreement.

### Roskamp and Archer Learn AIA Has No Right to the Patents and Thus Procured the Royalty Agreement Through Fraud

72.     On November 24, 2010, AIA filed a lawsuit against Avid Radiopharmaceuticals, Inc. ("Avid") and the Trustees of the University of Pennsylvania ("Penn") in the United States

13

Case ID: 140402014
Control No.: 15063384

District Court for the Eastern District of Pennsylvania (the "District Court"), Case No. 2:10-cv-06908 (the "Avid Action").

73.   In the Avid Action, AIA sought damages from Avid and Penn based on allegations that they had willfully infringed both the '169 patent and the '258 patent.

74.   The Avid Action was not the first such infringement lawsuit brought by AIA. In fact, AIA had previously filed multiple lawsuits against other entities associated with AD research. Many of the defendants in these cases chose not to fight AIA and settled, some paying AIA millions of dollars.

75.   In the Avid Action, Sexton testified that he formed AIA Foundation as a tax-exempt vehicle into which he funneled settlement proceeds received as a result of AIA's wrongful patent infringement lawsuits.

76.   Rather than settle, Avid and Penn contested AIA's charges and sought dismissal of the Avid Action on the grounds that AIA lacked standing to assert its purported rights under the '169 and '258 patents.

77.   A trial was held regarding the issue of AIA's standing in the Spring 2012. Hardy, Mullan, Goate, Houlden, Crawford and Newkome were among those that testified.

78.   After hearing the testimony, the jury found that (a) Mullan was not, in fact, the sole inventor of the '169 and '258 patents; (b) Hardy was at least a co-inventor of the '169 and '258 patents; and (c) USF, Mullan's employer at the time the application for the '169 patent was filed, did not knowingly and intentionally waive its rights to the invention.

Case ID: 140402014
Control No.: 15063384

79.    Accordingly, based on the jury's findings, the District Court concluded that AIA lacked standing to assert the '169 and '258 patents and entered judgment in favor of Avid and Penn.

80.    On May 16, 2014, the U.S. Court of Appeals for the Federal Circuit affirmed the District Court's judgment without opinion.

## COUNT I - FRAUD (Against AIA)

81.    Paragraphs 1-80 above are incorporated by reference as if fully set forth herein.

82.    By licensing the Patents to Roskamp Institute and Archer pursuant to the Royalty Agreement, AIA intentionally misrepresented to Plaintiffs that AIA held a valid interest in the Patents that would be subject to the license.

83.    AIA at all times knew that it had obtained title to the Patents wrongfully and through fraudulent means and in fact lacked rights in the Patents as a matter of law.

84.    AIA made these misrepresentations with the intention that they be relied upon by Plaintiffs in entering into the Royalty Agreement.

85.    AIA's misrepresentations were material to Plaintiffs' decision to enter into the Royalty Agreement, and but for AIA's misrepresentations, Plaintiffs would not have entered into the Royalty Agreement.

86.    Plaintiffs reasonably relied upon AIA's misrepresentations to their detriment in entering into the Royalty Agreement.

87.    AIA's misrepresentations caused Plaintiffs to enter into the Royalty Agreement, when they were otherwise under no duty to do so.

88.     As the direct, foreseeable, and proximate result of AIA's misrepresentations, Plaintiffs have suffered and continue to suffer damages, as aforesaid, for which they are entitled to recover against AIA.

## COUNT II - AIDING AND ABETTING FRAUD (Against Sexton and AIA Foundation)

89.     Paragraphs 1-88 above are incorporated by reference as if fully set forth herein.

90.     AIA committed the tort of fraud against Plaintiffs as described herein.

91.     Sexton knowingly and substantially assisted AIA's tortious conduct by, among other things, facilitating the conspiracy by which AIA fraudulently obtained title to the Patents by depriving Imperial College and USF of their rights thereto, and causing and/or facilitating AIA's filing of wrongful patent infringement lawsuits which it knew lacked merit because AIA held no legitimate rights in the Patents.

92.     AIA Foundation knowingly and substantially assisted AIA's tortious conduct by, among other things, serving as the vehicle through which AIA funneled settlement proceeds obtained from the wrongful patent infringement lawsuits.

93.     Sexton and AIA Foundation were aware of their respective roles as part of AIA's illegal and tortious activity at the time they provided the assistance.

94.     Plaintiffs have suffered and continued to suffer damages in an amount to be proven at trial as a result of the tortious conduct aided and abetted by Sexton and AIA Foundation.

## COUNT III - CIVIL CONSPIRACY (Against All Defendants)

95.     Paragraphs 1-94 above are incorporated by reference as if fully set forth herein.

Case ID: 140402014
Control No.: 15063384

96.     Defendants combined and conspired to commit the unlawful acts of fraud described herein.

97.     As described herein, AIA and Sexton created a plan to defraud Plaintiffs by falsely representing their ownership of the Patents to Plaintiffs to fraudulently induce Plaintiffs to enter into the Royalty Agreement.

98.     Sexton furthered AIA's unlawful plan by, among other things, facilitating the conspiracy by which AIA obtained purported title to the Swedish Mutation patents by fraudulently depriving Imperial College and USF of their rights, and causing and/or facilitating AIA's filing of wrongful patent infringement lawsuits which it knew lacked merit because AIA held no legitimate rights in the Patents.

99.     AIA furthered AIA's unlawful plan by, among other things, serving as the vehicle through which AIA funneled settlement proceeds obtained from the wrongful patent infringement lawsuits.

100.    Defendants' actions in furtherance of the conspiracy injured Plaintiffs, causing Plaintiffs to suffer damages in an amount to be proved at trial.

## COUNT IV – FAILURE OF CONSIDERATION (Against AIA)

101.    Paragraphs 1-100 above are incorporated by reference as if fully set forth herein.

102.    AIA at all times lacked rights in the Patents as a matter of law.

103.    Because AIA lacked rights in the Patents, the consideration bargained for by Plaintiffs in the Royalty Agreement did not pass, in whole or in part, to Plaintiffs.

104.    As a result of the failure of consideration, the Royalty Agreement is invalid and void, and Plaintiffs are entitled to the return of any and all consideration paid or provided to AIA

17

Case ID: 140402014
Control No.: 15063384

pursuant to the Royalty Agreement, including but not limited to, payments made pursuant to the Royalty Agreement, the Archer Shares and the '346 patent.

### COUNT V – UNJUST ENRICHMENT (Against All Defendants)

105.    Paragraphs 1-104 above are incorporated by reference as if fully set forth herein.

106.    Plaintiffs conferred a benefit on Defendants by, among other things, making payments to them pursuant to the Royalty Agreement, transferring the Archer Shares to them, and assigning the '346 patent in accordance with the Royalty Agreement.

107.    The Royalty Agreement pursuant to which Plaintiffs conferred such benefits upon Defendants was fraudulently induced by Defendants' misrepresentations.

108.    Defendants did not hold any valid interest in the Patents Plaintiffs licensed under the Royalty Agreement, and thus Plaintiffs received nothing of value from Defendants.

109.    Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them without requiring Defendants to pay Plaintiffs for such benefits.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants, and that the Court award Plaintiffs the following relief:

(a)    judgment in favor of the Plaintiffs and against Defendants for compensatory damages in excess of $50,000.00;

(b)    judgment in favor of the Plaintiffs and against the Defendants for punitive damages in the amount to be determined by the jury;

(c)    judgment declaring that Plaintiffs are entitled to rescission of the Royalty Agreement;

18

Case ID: 140402014
Control No.: 15063384

(d)     imposition of a constructive trust upon the Archer Shares and the '346 patent;

(e)     prejudgment interest, reasonable attorneys' fees, and costs; and

(f)     such other and further relief as the Court deems just.

KAUFMAN, COREN & RESS, P.C.

STEVEN M. COREN, ESQUIRE
MATTHEW R. WILLIAMS, ESQUIRE
DAVID M. DeVITO, ESQUIRE
PA Attorney ID Nos. 32140; 91820; 310622
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
215-735-8700

Dated: June 25, 2015          *Attorneys for Plaintiffs*

19

Case ID: 140402014
Control No.: 15063384

## VERIFICATION

I, Robert Roskamp, Chairman of the Board of Directors of The Roskamp Institute, Inc. and Archer Pharmaceuticals, Inc., hereby certify that I am authorized to make this verification on behalf of Plaintiffs The Roskamp Institute, Inc., Archer Pharmaceuticals, Inc., and Robert Roskamp, and verify that the averments of fact contained in the foregoing Amended Complaint are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Dated: June 25, 2015

Robert Roskamp

Case ID: 140402014
Control No.: 15063384

## CERTIFICATE OF SERVICE

I, Matthew R. Williams, Esquire, do hereby certify that on, June 25, 2015, I caused a true and correct copy of the foregoing Amended Complaint to be served by email and First-Class Mail, postage prepaid, upon the following:

Peter C. Buckley, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
pbuckley@foxrothschild.com
*Attorneys for Defendants*

Matthew R. Williams

Case ID: 140402014
Control No.: 15063384

## CERTIFICATE OF SERVICE

I, Matthew R. Williams, Esquire, do hereby certify that on June 25, 2015, I caused a true and correct copy of the foregoing Motion for Leave to File Amended Complaint to be served by email and First-Class Mail, postage prepaid, upon the following:

Peter C. Buckley, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
pbuckley@foxrothschild.com
*Attorneys for Defendants*

_____
Matthew R. Williams

Case ID: 140402014
Control No.: 15063384