## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE ROSKAMP INSTITUTE, INC. | : | |
| ARCHER PHARMACEUTICALS, INC., | : | |
| and ROBERT ROSKAMP, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | NO.   15-3641 |
| ALZHEIMER'S INSTITUTE OF | : | |
| AMERICA, INC., ALZHEIMER'S | : | |
| INSTITUTE OF AMERICA | : | |
| FOUNDATION, INC., and RONALD | : | |
| SEXTON, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S.J.                                                      October 22, 2015

Currently pending before the Court is the Motion for Remand by Plaintiffs, the Roskamp

Institute, Inc., Archer Pharmaceuticals, Inc., and Robert Roskamp (collectively "Plaintiffs").  For

the following reasons, the Motion is denied.

## I.     FACTUAL BACKGROUND

### A.     The Parties

According to the facts set forth in the Amended Complaint, Plaintiff Roskamp Institute,

Inc. ("Roskamp Institute") is a non-profit entity devoted to Alzheimer's Disease Research with

its place of incorporation and primary place of business in Florida; Plaintiff Archer

Pharmaceuticals, Inc. ("Archer") is a for-profit company organized under the laws of Delaware

with a place of business in Florida that develops and commercializes drug treatments for Alzheimer's that grow out of Roskamp Institute's research; and Plaintiff Robert Roskamp ("Roskamp") is a businessman and philanthropist, residing in Florida, who invests in and pays for the activities of Roskamp Institute and Archer with his personal funds and holds significant ownership stakes in both companies.  (Am. Compl. ¶¶ 1, 12–14.)

Defendants are Alzheimer's Institute of America, Inc. ("AIA"), Alzheimer's Institute of America Foundation, Inc. ("Foundation"), and Ronald Sexton ("Sexton") (collectively, "Defendants").  (Id. ¶ 15.)  At the time this action was commenced, AIA was a corporation organized under the laws of Florida with a place of business in Kansas, but, on May 13, 2015, Defendants merged Defendant AIA into a Kansas corporation.  AIA does not conduct any research or make any products, but purports to own certain patents and intellectual property rights relating to a genetic variation known as the Swedish Mutation, which is believed to cause Alzheimer's Disease ("AD").  (Id. ¶ 23.)  AIA's purported intellectual property rights include patents covering nucleic acids coding for the Swedish Mutation, U.S. Patent Number 5,455,169 ("'169 patent"); transgenic mice carrying the Swedish Mutation, U.S. Patent Number 7,538,258 ("'158 patent"); and certain other patents and intellectual property rights related thereto (collectively, the "Patents").  (Id. ¶ 26.)  The Foundation is a corporation organized under the laws of Delaware with a place of business in Missouri; and Sexton is an individual resident of Kansas.  (Id. ¶ 16–17.)  The Foundation's Facebook page identifies it as a division of AIA and indicates that it shares the same address as Roskamp Institute and Archer at 2040 Whitfield Avenue in Sarasota, Florida.  (Id. ¶¶ 24–25.)

2

B.    <u>**Relevant Facts**</u>

According to the Amended Complaint, Dr. John Hardy began studying AD in 1979 and, in 1985, he moved to St. Mary's Hospital Medical School in London—which later merged with Imperial College—where he started an AD laboratory and research program.  (<u>Id.</u> ¶ 28.)  In approximately 1988, Dr. Michael Mullan joined Hardy's lab as a research fellow and Ph.D student.  (<u>Id.</u> ¶ 29.)  In 1990, Hardy, along with several Dutch scientists, wrote a paper describing a genetic mutation known as the "Dutch Mutation."  (<u>Id.</u> ¶ 30.)  After discovering the Dutch Mutation, Hardy and his team began searching for amyloid precursor protein ("APP") mutations relating to AD, which led to the discovery of the first genetic mutation associated with AD, which came to be known as the "London Mutation."  (<u>Id.</u> ¶ 31.)  In January 1991, a patent application was filed for the London Mutation in the United Kingdom, which named Hardy, Mullan, and three others as co-inventors.  (<u>Id.</u> ¶ 32.)  Under the U.K. Patent Act of 1977—which provides that inventions made by employees in the course of their normal duties belong to the employer—the rights to the London Mutation were owned by Imperial College.  (<u>Id.</u> ¶ 33.)

The London Mutation inventors also suggested patenting transgenic animals carrying the mutation, but were advised by Imperial College's technology transfer arm, Imperial Exploitation Limited ("IMPEL"), that transgenic animals were not patentable under U.K. law.  (<u>Id.</u> ¶ 34.)  IMPEL's advice, however, was erroneous.  (<u>Id.</u>)  In February 1991, a company called Athena Neurosciences, Inc. ("Athena") approached Imperial College, through Hardy, with a proposal to sponsor his team's research.  (<u>Id.</u> ¶ 35.)  On August 1, 1991, Imperial College, IMPEL, and Athena executed a Sponsored Research Agreement (the "Athena Agreement").  (<u>Id.</u>)  Athena then noticed IMPEL's error and revised the U.K. patent application to cover transgenic animals

with the London Mutation.  (Id.)  Pursuant to the Athena Agreement, Athena received the exclusive rights to transgenic animals with the London Mutation, as well as any AD discoveries from Hardy's lab at Imperial College.  (Id. ¶ 36.)

Upon learning that IMPEL had given them erroneous advice, and believing their rights to their discovery of the London Mutation had been undervalued, Hardy and his team became disappointed with the Athena Agreement.  (Id. ¶ 37.)  At this time, Sexton, a businessman from Kansas City, saw an opportunity in Hardy's team.  (Id. ¶ 38.)  Sexton persuaded Hardy and Mullan to sign an agreement giving Sexton's company, Euroinvest Limited ("Euroinvest"), exclusive rights in their research.  (Id. ¶ 39.)  In turn, Hardy and Mullan, with the assistance of London law firm Sexton and Clyde & Co., made several attempts to challenge Imperial College's claim to the London Mutation patent.  (Id. ¶ 40.)  When those efforts were unsuccessful, Dr. Alison Goate—a junior scientist on Hardy's team—wrote a letter to Imperial College in which she claimed that Mullan had conceived the London Mutation before he became employed at Imperial College.  (Id. ¶ 41.)  Imperial College rejected this claim, and Hardy and Goate later testified that the letter was false.  (Id. ¶¶ 42–43.)  Unable to get out of the Athena Agreement and seeking to avoid Athena's option on any new APP mutations, Hardy's team agreed to not identify any additional mutations while working at Imperial College.  (Id. ¶ 44.)  In turn, Hardy decided to move his laboratory from Imperial College to the University of South Florida ("USF") in order to continue his research.  (Id. ¶ 45.)  At Hardy's request, USF hired Mullan as a research assistant, and he arrived at USF in December 1991 to begin setting up Hardy's lab.  (Id. ¶ 46.)  Hardy remained at Imperial College until May 1992, waiting for the new lab to be constructed at USF.  (Id.)

4

In early 1992, a team of researchers at the Karolinska Institute in Sweden collected DNA samples from Swedish families with AD and, in February 1992, a Swedish scientist visited Hardy at Imperial College and delivered several of those samples.  (Id. ¶ 47.)  Hardy then asked a lab technician at Imperial College, Henry Houlden, to conduct a "GT12 analysis" (genetic studies) on the DNA from two of the families.  (Id. ¶ 48.)  The analysis was performed over several weeks and Houlden provided the results to Hardy in London.  (Id. ¶ 49.)  Upon analyzing the data, Hardy concluded that it suggested a strong likelihood of mutation on the APP gene in both families.  (Id. ¶ 49.)  To prevent Imperial College and Athena from obtaining the rights to the new mutation, Hardy instructed Houlden to send selected DNA samples from the two families to Mullan to have them sequenced in Florida.  (Id. ¶ 50.)  Although Mullan could not sequence the DNA on his own, Hardy knew that Fiona Crawford (then a Ph.D. student from Hardy's team at Imperial College) had experience in DNA sequencing and would soon arrive in Florida.  (Id. ¶ 51.)  Upon her arrival, Crawford sequenced the DNA samples at Tampa Bay Research Institute, which was off USF's campus.  (Id. ¶ 52.)  Crawford's sequencing revealed that the DNA of the affected Swedish family members did, in fact, contain a double mutation, which became known as the "Swedish Mutation."  (Id. ¶ 53.)

In late April 1992, work immediately began on a patent application for the Swedish Mutation, as well as a publication describing the discovery.  (Id. ¶ 54.)  To avoid either Imperial College or USF obtaining the rights to the invention, Mullan and Hardy agreed that Hardy's name would not appear on any patent application or publication since Hardy was still an employee of Imperial College.  (Id. ¶¶ 55–56.)  Because Mullan was a USF employee, however, USF's regulations and Florida law dictated that USF would have rights to the Swedish Mutation.

5

(Id. ¶ 57.)  To avoid this problem, Sexton's lawyers sent USF a letter describing Hardy and

Mullan's work on the London Mutation and their resulting dispute with Imperial College over

the rights to that invention, without disclosing the discovery of the Swedish Mutation.  (Id. ¶ 59.)

Dr. George Newkome, USF's Vice President for Research, interpreted the letter as requesting

USF's confirmation that the university would not assert rights in Hardy's and Mullan's London

Mutation research.  As prepared by Sexton's lawyers, however, the letter asked USF to agree that

"all ownership of rights in any work carried out by [Hardy and Mullan] and inventions made by

them (whether before or after the date of this letter) belong exclusively to Hardy and Mullan."

(Id. ¶ 60.)  Newkome met with Hardy, Mullan, and Sexton to discuss the letter, but was still not

told of the discovery of the Swedish Mutation.  In fact, Newkome was informed that because

Hardy's new lab was still incomplete, "there was really nothing going on."  (Id. ¶ 61.)  At the

close of that meeting, Newkome revised the letter to provide that USF would agree that any work

done or inventions made by Hardy and Mullan prior to August 15, 1992 (the start of the

upcoming semester at USF) would belong to Hardy and Mullan.  (Id. ¶ 62.)  On May 4, 1992,

Newkome signed the letter with those revisions.  (Id.)

The next day, on May 5, 1992, Sexton incorporated AIA.  (Id. ¶ 63.)  The patent

application for the Swedish Mutation, listing Mullan as the sole inventor, was filed on June 4,

1992.  (Id. ¶ 64.)  Mullan assigned all of his rights in the Swedish Mutation invention to AIA on

July 15, 1992.  (Id. ¶ 65.)

Believing AIA to be the rightful owner of the Patents and wishing to use these Patents in

their research and development activities, Plaintiffs Roskamp and Archer engaged in negotiations

with AIA concerning their use.  (Id. ¶ 66.)  Effective February 7, 2008 (the "Effective Date"),

6

Roskamp, Archer, and AIA entered into a contract entitled Agreement for Consideration and Royalty Payments Paid to Alzheimer's Institute of America, Inc. (the "Royalty Agreement"). (Id. ¶ 67.)  The Royalty Agreement provided that it was governed by the laws of Pennsylvania and that all parties agreed to submit to jurisdiction in courts located in Philadelphia, Pennsylvania.  (Id. ¶ 68.)  Pursuant to the Royalty Agreement, Roskamp and Archer acquired a revocable, non-exclusive license to use the Patents.  (Id. ¶ 69.)  In return, Roskamp and Archer promised AIA the following: (a) payment of $1,000,000 upon execution of the Royalty Agreement, plus additional future payments totaling $11,750,000 linked to certain milestones; (b) twenty-five percent of the outstanding equity shares of Archer as of the Effective Date (the "Archer Shares"); and (c) assignment to AIA of their rights to any inventions discovered through the use of the Patents.  (Id. ¶ 70.)  Following execution of the Royalty Agreement, and through use of the Patents, Roskamp Institute scientists discovered that the drug Nilvadipene, originally developed to treat high blood pressure, could be used to treat AD.  (Id. ¶ 71.)  Roskamp Institute obtained a patent on this discovery, U.S. Patent Number 8,236,346 ("'346 patent"), which was assigned to AIA pursuant to the Royalty Agreement.  (Id.)

On November 24, 2010, AIA filed a lawsuit against Avid Radiopharmaceuticals, Inc. ("Avid") and the Trustees of the University of Pennsylvania ("Penn") in the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 10-6908 (the "Avid Action").  (Id. ¶ 72.)  AIA sought damages from Avid and Penn based on allegations that they had willfully infringed both the '169 patent and the '258 patent.  (Id. ¶ 73.)  The Avid Action was just another in a series of lawsuits filed by AIA against other entities associated with AD research, many of whom simply settled with AIA for millions of dollars.  (Id. ¶ 74.)  During the

Avid Action, Sexton testified that he formed the AIA Foundation as a tax-exempt vehicle into which he funneled settlement proceeds received as a result of AIA's wrongful patent infringement lawsuits.  (Id. ¶ 75.)  Avid and Penn contested AIA's charges and sought dismissal of the Avid Action on the grounds that AIA lacked standing to assert its purported rights under the '169 and '258 patents.  (Id. ¶ 76.)  During trial on the issue of AIA's standing, Hardy, Mullan, Goate, Houlden, Crawford, and Newkome testified.  (Id. ¶ 77.)  After hearing the testimony, the jury found that: (a) Mullan was not, in fact, the sole inventor of the '169 and '258 patents; (b) Hardy was at least a co-inventor of the '169 and '258 patents; and (c) USF, Mullan's employer at the time the application for the '169 patent was filed, did not knowingly and intentionally waive its rights to the invention.  (Id. ¶ 78.)  Based on the jury's findings, the District Court concluded that AIA lacked standing and entered judgment in favor of Avid and Penn.  (Id. ¶ 79.)  The United States Court of Appeals for the Third Circuit affirmed on May 16, 2014.  (Id. ¶ 80.)

### C.   **Procedural History**

On April 18, 2014, Plaintiffs commenced this litigation by Writ of Summons in the Court of Common Pleas for Philadelphia County.  (Pls.' Mot. for Remand, Ex. C.)  Slightly more than a year later, on May 13, 2015, Defendants merged Defendant AIA America, Inc., a Florida corporation, into AIA America, Inc., a Kansas corporation.  Following Defendants' Praecipe to File Complaint, Plaintiffs filed their original Complaint on June 9, 2015.  (Id., Exs. D, E.)  On June 25, 2015, Plaintiffs submitted a Motion for Leave to File an Amended Complaint, which attached a copy of their proposed Amended Complaint.  This Amended Complaint set forth five causes of action alleging (1) fraud; (2) aiding and abetting fraud; (3) civil conspiracy; (4) failure of consideration; and (5) unjust enrichment.

On June 29, 2015, Defendants filed a Notice of Removal removing the case to this Court. The parties thereafter stipulated, with Court approval, that (a) Defendants consented to Plaintiffs' filing of the Amended Complaint; (b) Plaintiffs' Motion for Remand would be due by July 29, 2015; and (3) Defendants' Response to the Amended Complaint would be stayed until the Court resolved the Motion.  (Id., Ex. G.)

Plaintiffs filed the current Motion for Remand on July 29, 2015 and Defendants responded on August 17, 2015.  The Motion is now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 1441(a), a defendant may remove a civil action filed in a state court if the federal court would have had original jurisdiction over the action.  28 U.S.C. § 1441(a).  A defendant seeking removal of an action must file a petition for removal with the district court within thirty days of plaintiff's service of the complaint upon defendant.  See 28 U.S.C. § 1446(b). "The defendants bear the burden of establishing removal jurisdiction and compliance with all pertinent procedural requirements."  Winnick v. Pratt, No. Civ.A.03-1612, 2003 WL 21204467, at *2 (E.D. Pa. May 20, 2003) (citing Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990).

Once an action is removed, a plaintiff may challenge removal by seeking a remand of the case back to state court.  Cook v. Soft Sheen Carson, Inc., No. Civ.A.08-1542, 2008 WL 4606305, at *1 (D.N.J. Oct. 15, 2008).  Remand to the state court is appropriate for:  "(1) lack of district court subject matter jurisdiction or (2) a defect in the removal process."  PAS v. Travelers Ins. Co., 7 F.3d 329, 352 (3d Cir. 1993).  Remand is mandatory and can occur at any time during the litigation if the court determines that it lacks federal subject matter jurisdiction.  Kimmel v.

9

DeGasperi, No. Civ.A.00-143, 2000 WL 420639, at *1 (E.D. Pa. Apr. 7, 2000) (citing 28 U.S.C.

§ 1447(c)).  A motion to remand the case on the basis of any defect in the removal procedure,

however, must be submitted within thirty days after filing of the notice of removal under section

1446(a).  28 U.S.C. § 1447(c); N. Penn Water Auth. v. Bae Sys. Aerospace Elec., Inc., No.

Civ.A.04-5030, 2005 WL 1279091, at *5 (E.D. Pa. May 25, 2005).  Upon a motion to remand,

"it is always the removing party's burden to prove the propriety of removal, and any doubts about

the existence of federal jurisdiction must be resolved in favor of remand."  Lumbermans Mut.

Cas. Co. v. Fishman, No. Civ.A.99-929, 1999 WL 744016, at *1 (E.D. Pa. Sep. 22, 1999) (citing

Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3d Cir.1992)); see also Boyer, 913 F.2d at 111

(The removal statutes "are to be strictly construed against removal and all doubts should be

resolved in favor of remand.") (quoting Steel Valley Auth. v. Union Switch & Signal Div., 809

F.2d 1006, 1010 (3d Cir. 1987)); see also Palmer v. Univ. of Med. and Dentistry of N.J., 605 F.

Supp. 2d 624, 627 (D.N.J. 2009) ("A party opposing remand must show that removal was

proper.").

## III.   DISCUSSION

In the current Motion, Plaintiff concedes that the removal of this case was procedurally

proper, but denies that the Court has subject matter jurisdiction over the removed Complaint.

Defendants, on the other hand, claim that federal subject matter jurisdiction exists under 28

U.S.C. § 1332(a), which states that:

> district courts . . . have original jurisdiction of all civil actions where the matter in
> controversy exceeds the sum or value of $75,000, exclusive of interest and costs,
> and is between – (1) citizens of different States; (2) citizens of a State and citizens
> or subjects of a foreign state; (3) citizens of different States and in which citizens

or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a).  A natural person is deemed to be a citizen of the state where he or she is domiciled.  Swiger v. Allegheny Energy, Inc., 540 F.3d 179, 182 (3d Cir. 2008) (citing Gilbert v. David, 235 U.S. 561, 569 (1915)).  A corporation is a citizen both of the state where it is incorporated and of the state where it has its principal place of business.  Id. (citing 28 U.S.C. § 1332(c)).  Under the "complete diversity" rule, all plaintiffs must be diverse from all defendants. Id. at 183; see also Sabric v. Lockheed Martin, No. Civ.A.09-2237, 2010 WL 569573, at *1 (M.D. Pa. Feb. 10, 2010) (citing Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978)).

In the present case, Plaintiffs Roskamp Institute and Roskamp are citizens of Florida and Plaintiff Archer is a citizen of Delaware.  Defendant AIA, although once a citizen of Florida, has been merged into AIA, a citizen of Kansas.[1]  Defendant Sexton is also a citizen of Kansas.

---

[1]  Plaintiffs make repeated allegations that "[m]ore than a year after Plaintiffs commenced suit in state court against two non-diverse defendants (AIA and Foundation), Defendants merged Defendant AIA, a Florida corporation, into an identical entity organized under the laws of Kansas in a *post hoc* attempt to manufacture diversity with Plaintiff Roskamp, a citizen of Florida." (Pls.' Mem. Supp. Mot. to Remand 2; see also id. at 7.)  This assertion, however, does not give the Court any pause for two reasons.  First, Plaintiffs fail to assert or establish that the merger was improper.  Second, although the merger occurred after the initiation of Plaintiffs' lawsuit, Plaintiffs had only filed a writ of summons at the time the merger occurred on May 13, 2015. Plaintiffs did not file their original Complaint until June 9, 2015, and did not file their Amended Complaint until June 25, 2015.  Thus, at the time the Complaint was filed, AIA was properly a citizen of Kansas.  It is well established that a writ of summons alone cannot be the "initial pleading" that triggers the 30–day period for removal under the first paragraph of 28 U.S.C. § 1446(b).  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 223 (3d Cir. 2005).  "Where, as here, defendants are served with a summons and the complaint is filed at a later date, the thirty day period commences from the time the defendants received a copy of the complaint."  Polanco v. Coneqtec Universal, 474 F. Supp. 2d 735, 737 (E.D. Pa. 2007).  Consistent with that principle,

Finally, the Foundation is a citizen of Delaware.  Given that Archer and the Foundation are citizens of the same state, complete diversity, pursuant to 28 U.S.C. § 1332(a), does not exist.

To overcome this obstacle, Defendants contend that the Foundation has been fraudulently joined.  Under this doctrine, "'[w]hen a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined.'"  In re Briscoe, 448 F.3d 201, 217 (3d Cir. 2006) (quoting Batoff v. State Farm Ins. Co., 977 F.2d 848, 851–52 (3d Cir. 1992)).  Because the "right of removal cannot be defeated by a fraudulent joinder of a resident defendant," a district court may disregard the citizenship of any fraudulently joined defendant when assessing the propriety of removal premised on diversity jurisdiction.  In re Avandia Mktg., 624 F. Supp. 2d 396, 411 (E.D. Pa. 2009) (quotations omitted).  "'Fraudulent joinder' is a term of art—a demonstration of outright fraud or bad faith is not necessary to render a party fraudulently joined."  Lopez v. Home Depot, Inc., No. Civ.A.08-1020, 2008 WL 2856393, at *2 (E.D. Pa. Jul 22, 2008).  Rather, as set forth by the Third Circuit, joinder is fraudulent where "'there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment.'"  Briscoe, 448 F.3d at 216 (quoting Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 32 (3d Cir. 1985)).  The removing party carries a "heavy burden of persuasion" in making a showing of fraudulent joinder.  Steel Valley Auth. v. Union Switch & Signal Div., 809

---

the rule is clear that "[w]hether diversity jurisdiction exists is determined by examining the citizenship of the parties at the time the *complaint* was filed."  Midlantic Nat. Bank v. Hansen, 48 F.3d 693, 696 (3d Cir. 1995) (emphasis added).

F.2d 1006, 1012 n.6 (3d Cir. 1987); <u>see also</u> <u>Crawford v. Allstate</u>, No. Civ.A.08-5483, 2009 WL 2778851, at *2 (E.D. Pa. Aug. 31, 2009).

A district court may base a finding of fraudulent joinder on factual or legal grounds. <u>Avandia Mktg.</u>, 624 F. Supp. 2d at 411–12.  Joinder is legally fraudulent if the court determines that a claim is "wholly insubstantial and frivolous" in light of the relevant case law.  <u>Batoff</u>, 977 F.2d at 852.  "[W]here there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses." <u>Boyer</u>, 913 F.2d at 113 (citations omitted).  Moreover, a district court's examination of the law is not as exacting as review on a motion to dismiss and the court must be careful not to delve too deep into substantive matters.  <u>Batoff</u>, 977 F.2d at 852.  "'Simply because we come to believe that, at the end of the day, a state court would dismiss the allegations against a defendant for failure to state a cause of action does not mean that the defendant's joinder was fraudulent.'" <u>City of Phila. v. Hotels.com</u>, No. Civ.A.05-4391, 2005 WL 2573146, at *3 (E.D. Pa. Oct. 11, 2005) (quoting <u>Lyall v. Airtran Airlines, Inc.</u>, 109 F. Supp. 2d 365, 367–68 (E.D. Pa. 2000)).

When evaluating whether a defendant's joinder is factually fraudulent, the district court must focus on the plaintiff's complaint at the time the petition for removal was filed, must assume as true all of the factual allegations of the complaint, and must resolve all uncertainties as to the current state of controlling law in favor of plaintiff.  <u>Batoff</u>, 977 F.2d at 851–52.  A district court, however, need not "blindly . . . accept whatever plaintiffs may say no matter how incredible or how contrary the overwhelming weight of the evidence." <u>Reeser v. NGK Metals Corp.</u>, 247 F. Supp. 2d 626, 629 (E.D. Pa. 2003).  Thus, "limited piercing of the allegations to

13

discover fraudulent joinder" may be appropriate.  Boyer, 913 F.2d at 112.  Contested issues of substantive fact, however, must be resolved in plaintiff's favor and the district court may not step "from the threshold jurisdictional issues into a decision on the merits."  Id. at 111–12.

In the present case, Plaintiffs assert three causes of action against Foundation: (1) civil conspiracy; (2) aiding and abetting fraud; and (3) unjust enrichment.  Defendants contend that none of these are viable claims.  The Court addresses each claim individually.

### A.   Civil Conspiracy

Plaintiffs' civil conspiracy claim alleges, in pertinent part as follows:

96.   Defendants combined and conspired to commit the unlawful acts of fraud described herein.

97.   As described herein, AIA and Sexton created a plan to defraud Plaintiffs by falsely representing their ownership of the Patents to Plaintiffs to fraudulently induce Plaintiffs to enter into the Royalty Agreement.

98.   Sexton furthered AIA's unlawful plan by, among other things, facilitating the conspiracy by which AIA obtained purported title to the Swedish Mutation patents by fraudulently depriving Imperial College and USF of their rights, and causing and/or facilitating AIA's filing of wrongful patent infringement lawsuits which it knew lacked merit because AIA held no legitimate rights in the Patents.

99.   AIA [Foundation][2] furthered AIA's unlawful plan by, among other things, serving as the vehicle through which AIA funneled settlement proceeds obtained from the wrongful patent infringement lawsuits.

100.  Defendants' actions in furtherance of the conspiracy injured Plaintiffs, causing Plaintiffs to suffer damages in an amount to be proved at trial.

(Am. Compl. ¶¶ 96–100.)

---

[2]  Paragraph 99 of the Amended Complaint only states that "AIA furthered AIA's unlawful plan . . . ."  Comparing this paragraph to the virtually identical allegation in Paragraph 92, the Court must assume that Paragraph 99 meant to state that "AIA *Foundation* furthered AIA's unlawful plan . . . ."

14

To state a cause of action for civil conspiracy, the plaintiff must demonstrate: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (citation and internal quotations omitted).  An "'actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.'" Levin v. Upper Makefield Twp., 90 F. App'x 653, 667 (3d Cir. 2004) (quoting In re Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999)).  Ultimately, "only a finding that the underlying tort has occurred will support a claim for civil conspiracy." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 506 (E.D. Pa. 2008) (quotation omitted).  "Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." Duffy v. Lawyers Title Ins. Co., 972 F. Supp. 2d 683, 698 (E.D. Pa. 2013).

Defendants now contend that the civil conspiracy claim fails on two grounds.  First, they assert that the claim is barred by the parol evidence rule.  Second, they claim that even if the parol evidence rule does not bar the claim, Plaintiffs have failed to allege how the Foundation affirmatively conspired with the other Defendants to participate in the alleged fraud.[3]  The Court addresses each argument individually.

---

[3]  Defendants also argue that the conspiracy claim must fail because Defendant Sexton cannot conspire with himself.  As the Court finds that the Foundation was fraudulently joined on other grounds, this third argument shall not be addressed.

1. __Parol Evidence Rule__

Plaintiffs' fraudulent inducement claim alleges that AIA "intentionally misrepresented to Plaintiffs that AIA held a valid interest in the Patents that would be subject to the license" despite knowing that it had obtained title to the Patents wrongfully and, therefore, lacked rights in the Patents as a matter of law.  (Am. Compl. ¶¶ 82–83.)  These misrepresentations, according to Plaintiffs, were made with the intention that they be relied upon by Plaintiffs and caused Plaintiffs to enter into the Royalty Agreement.  (Id. ¶ 87.)

Defendants now argue that this fraudulent inducement claim is not actionable under Pennsylvania law.  In Pennsylvania, the parol evidence rule provides:

> Where the parties to an agreement adopt a writing as the final and complete expression of their agreement . . . evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement. Alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract. The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract.

1726 Cherry St. P'ship v. Bell Atl. Props., Inc., 653 A.2d 663, 665 (Pa. Super. Ct. 1995) (quotation omitted); see also HCB Contractors v. Liberty Place Hotel Assocs., 652 A.2d 1278, 1279 (Pa. 1995).  In other words, "[w]here prior fraudulent representations are alleged, the parol evidence rule bars such representations where the written agreement: (1) contains terms which directly deal with the subject matter of the alleged oral representation; and (2) represents the entire contract between the parties, particularly where the written agreement also contains an

integration clause.  Atl. Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 489 (E.D. Pa. 2009).  Notably, "[t]o satisfy the 'same subject matter' requirement, the written contract need not directly contradict the prior representation, but rather need only 'relate to subjects that were specifically addressed in the written contract.'"  Atl. Pier Assocs., 647 F. Supp. 2d at 489–90 (citing HCB Contractors, 652 A.2d 1279–80; Nicolella v. Palmer, 248 A.2d 20, 22 (Pa. 1968)).  "Pennsylvania seeks to protect parties from fraudulent inducement claims which could have been prevented by more complete, more thorough contract formation."  Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp. 2d 589, 592 (E.D. Pa. 1999); see also Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1300 (3d Cir. 1996) ("The Supreme Court of Pennsylvania found that the parol evidence rule barred consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently omitted from the contract.").

In the present case, the underlying fraudulent inducement claim that is the object of the conspiracy is unequivocally barred by the parol evidence rule.  Section 6.03 of the Royalty Agreement, captioned "NO REPRESENTATIONS OR WARRANTIES" expressly disclaims any representation about the validity of AIA's patents by stating that "[e]xcept as expressly provided in this AGREEMENT, nothing in this AGREEMENT shall be construed as . . . (ii) a warranty or representation by AIA as to the validity, enforceability or scope of any patents or patent applications contained in the AIA Patents."  (Royalty Agreement § 6.03(A)(ii).)  Accordingly, in satisfaction of the first element, the contract contains terms which directly deal with the subject matter of the alleged oral fraudulent misrepresentation.  Moreover, in satisfaction of the second element, the Agreement contains an integration clause as follows: "[t]his document states the

17

entire contract between the parties about its subject matter.  All past and contemporaneous

discussions, agreements, proposals, promises, warranties, representations, guarantees,

correspondence, and understandings, whether oral or written, formal or informal, are entirely

superseded by this AGREEMENT."  (Id. § 9.08.)  "An integration clause which states that a

writing is meant to represent the parties' entire agreement is . . . a clear sign that the writing is

meant to be just that and thereby expresses all of the parties' negotiations, conversations, and

agreements made prior to its execution."  Atl. Pier Assocs., 647 F. Supp.2d at 491.

In light of the foregoing, Plaintiffs cannot plausibly allege a claim of fraudulent

inducement against Defendants based on an allegation that "AIA and Sexton created a plan to

defraud Plaintiffs by falsely representing their ownership of the Patents to Plaintiffs to

fraudulently induce Plaintiffs to enter into the Royalty Agreement."  (Am. Compl. ¶ 97.)  In turn,

Plaintiffs cannot satisfy the first element of a civil conspiracy claim, which requires a

combination of two or more persons acting with a common purpose to do an unlawful act or to

do a lawful act by unlawful means or for an unlawful purpose.  Ultimately, then, Plaintiffs cannot

sustain a claim for civil conspiracy against the Foundation.[4]

## 2.    No Allegation of How the Foundation Conspired

Alternatively, even if Plaintiffs could establish a feasible underlying tort for the alleged

civil conspiracy, they have failed to allege how the Foundation affirmatively conspired with the

other Defendants to participate in the alleged fraud.  For a cause of action in civil conspiracy to

succeed, "it must be shown that two or more persons combined or agreed with intent to do an

---

[4]  While this ruling clearly affects the viability of the claims against the other Defendants,
that issue is not properly before the Court in this Motion.

unlawful act or to do an otherwise lawful act by unlawful means." Rumbaugh v. Beck, 601 A.2d 319 (Pa. Super. Ct. 1991) (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466 (Pa. 1979)).  As noted above, Plaintiffs assert that the purpose of the conspiracy was to implement AIA and Sexton's plan to defraud Plaintiffs by falsely representing their ownership of the Patents to fraudulently induce Plaintiffs to enter into the Royalty Agreement.  Plaintiffs go on to assert that the Foundation "furthered AIA's unlawful plan by, among other things, serving as the vehicle through which AIA funneled settlement proceeds obtained from the wrongful patent infringement lawsuits."  (Am. Compl. ¶ 99.)

This allegation fails to create any possible inference that the Foundation participated in the alleged conspiracy.  Primarily, the Foundation's mere receipt of funds from purportedly false patent infringement lawsuits filed by AIA does not show that the Foundation participated in the plan to fraudulently induce Plaintiffs to enter the Royalty Agreement by misrepresenting their ownership of the Patents at issue.  Moreover, Plaintiffs make no allegation that the Foundation received any of the proceeds from the Royalty Agreement; rather it purportedly received proceeds only from patent infringement suits filed by AIA against third parties.  Finally, and perhaps more importantly, it is undisputed that the Foundation did not even exist at the time of the alleged fraudulent inducement and, in fact, was not formed until almost two years after the Royalty Agreement was signed.  Thus, it would have been impossible for the Foundation to conspire with AIA to commit the alleged tortious conduct of fraudulently inducing Plaintiffs to enter into the Royalty Agreement.  As such, the Court finds that the Foundation was fraudulently joined in the civil conspiracy claim on this ground as well.

### B.     Aiding and Abetting Fraud

Pursuant to the Second Restatement of Torts, a defendant is subject to liability for the tortious action of another in three circumstances:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876.  Beginning with the Pennsylvania Supreme Court's decision endorsing § 876(a) of the Second Restatement's "concert of action" theory in Skipworth by Williams v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997), Pennsylvania courts have begun to accept claims for giving substantial assistance or encouragement to another tortfeasor under § 876(b) as well.  See, e.g., Sovereign Bank v. Valentino, 914 A.2d 415, 422–24 (Pa. Super. Ct. 2006); Koken v. Steinberg, 825 A.2d 723, 731–32 (Pa. Commw. Ct. 2003).  A number of federal courts have similarly recognized that aiding and abetting tortious conduct claims would be viable under Pennsylvania law.  See, e.g., Panthera Rail Car LLC v. Kasgrow Rail Corp., No. Civ.A.13-679, 2013 WL 4500468, at *9 (W.D. Pa. Aug. 21, 2013); In re Le-Nature's Inc., v. Wachovia Capital Mkts., LLC, No. Civ.A.08-1518, 2009 WL 3571331, at *15 (W.D. Pa. Sept. 16, 2009); Gilliland v. Hergert, No. Civ.A.05-1059, 2007 WL 4105223, at *7–8 (W.D. Pa. Nov. 15, 2007); Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC, 513 F. Supp. 2d 304, 318 (E.D. Pa. 2007).

Similar to the civil conspiracy claim, Plaintiffs in this case fail to allege an actionable underlying fraud that the Foundation could have aided and abetted.  As discussed in detail above, the alleged fraud claim is based on Defendants' representations that they owned and maintained valid patents, which fraudulently induced Plaintiffs into entering the Royalty Agreement.  Under Pennsylvania law, however, such a claim is barred by the parol evidence rule because the Royalty Agreement (a) contained terms that directly dealt with the subject matter of the alleged misrepresentation and (b) was a fully integrated contract.  Absent a viable claim of fraud, the Foundation could not have aided and abetted any tort.

Moreover, Plaintiff have failed to set forth any factual allegations indicating how the Foundation provided "substantial assistance" to the other Defendants in committing the alleged fraud.  The Restatement suggests five factors to be used in determining whether assistance or encouragement is substantial enough to be deemed aiding and abetting: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor] and his state of mind."  Bair v. Purcell, 500 F. Supp. 2d 468, 496 (M.D. Pa. 2007) (citing Restatement (Second) of Torts § 876(b)) (further quotations and citations omitted).  Given that the Foundation was not in existence at the time of the alleged fraudulent inducement, Plaintiffs are hard pressed to assert that the Foundation provided any assistance whatsoever to the other Defendants.  Accordingly, the Court finds that the Foundation was fraudulently joined to this claim as well.

### C.    Unjust Enrichment

The last remaining claim against the Foundation asserts unjust enrichment.  Specifically,

Count V of the Amended Complaint states:

> 106.   Plaintiffs conferred a benefit on Defendants by, among other things, making payments to them pursuant to the Royalty Agreement, transferring the Archer Shares to them, and assigning the '346 patent in accordance with the Royalty Agreement.

> 107.   The Royalty Agreement pursuant to which Plaintiffs conferred such benefits upon Defendants was fraudulently induced by Defendants' misrepresentations.

> 108.   Defendants did not hold any valid interest in the Patents Plaintiffs licensed under the Royalty Agreement, and thus Plaintiffs received nothing of value from Defendants.

> 109.   Under the circumstances, it would be unjust for Defendants to retain the benefits conferred upon them without requiring Defendants to pay Plaintiffs for such benefits.

(Am. Compl. ¶¶ 106–09.)

Under Pennsylvania law for quasi-contracts, a claim of unjust enrichment must allege the following elements: (1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit.  Commw. ex. rel. Pappert v. TAP Pharm. Prods., Inc., 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005); see also Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (noting that "[t]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (internal quotation omitted)).  "The polestar of the unjust enrichment inquiry is whether the defendant has been *unjustly* enriched; the intent of the parties is irrelevant."  Limbach v. City of Phila., 905 A.2d 567, 577 (Pa. Commw. Ct. 2006) (emphasis in original).  "'In order to recover, there must be *both* (1) an enrichment, and

22

(2) an injustice resulting if recovery for the enrichment is denied.'" <u>Samuels v. Hendricks</u>, 445

A.2d 1273, 1275 (Pa. Super. Ct. 1982) (emphasis in original) (quoting <u>Meehan v. Cheltenham</u>

<u>Twp.</u>, 189 A.2d 593, 595 (Pa. 1963)).

      In the present case, Plaintiffs argue that they have stated a colorable claim of unjust

enrichment against the Foundation because the Amended Complaint asserts that the Foundation

"improperly and unjustly received benefits from the Plaintiffs, all of which were derived through

Defendants' fraudulent and conspiratorial conduct in which the Foundation was complicit."

(Pls.' Mem. Supp. Mot. to Remand 13.)  Plaintiffs' argument, however, misrepresents the actual

allegations of the Amended Complaint.  At no point in the Amended Complaint do Plaintiffs

assert that they conferred any benefit on the Foundation, which the Foundation has unjustly

retained.  Indeed, nothing in the Amended Complaint asserts that the Foundation received any of

the monies collected from Plaintiffs pursuant to the Royalty Agreement.  Rather, as repeatedly

noted above, the Foundation was not formed until almost two years after the other parties entered

into the Royalty Agreement.  Moreover, the Amended Complaint states only that the Foundation

received millions of dollars of settlement proceeds obtained by AIA through patent infringement

lawsuits against companies/individuals who are not parties to this suit.  (Am. Compl. ¶¶ 7, 75.)

Having failed to allege the most basic elements of the claim, Plaintiffs cannot maintain an unjust

enrichment action against the Foundation.

## IV.    CONCLUSION

      Ultimately, the Court finds that there is no reasonable basis in fact or colorable ground

supporting the claims against the Foundation.  With respect to the civil conspiracy and the aiding

and abetting fraud claims, the Amended Complaint reveals that the underlying tort in both of those causes of action—fraudulent inducement—is barred by Pennsylvania's parol evidence rule, thereby precluding the imposition of any aiding and abetting or conspiracy liability.  Moreover, even if such claims were actionable, Plaintiffs have completely failed to set forth either any agreement by the Foundation to participate in a conspiracy or substantial assistance rendered by the Foundation to the other Defendants.  Finally, as to the unjust enrichment claim, Plaintiffs have not identified any substantial benefit that they conferred upon the Foundation, from which the Foundation has unjustly benefitted.  In short, focusing on Plaintiffs' Complaint at the time the petition for removal was filed, assuming as true all of the factual allegations of the Amended Complaint, and resolving all uncertainties as to the current state of controlling law in favor of Plaintiff, the Court finds that Plaintiffs have no viable claims against the Foundation, meaning that its joinder in this case is fraudulent.

This finding, in turn, reveals this case to properly be in this Court on diversity jurisdiction.  The Foundation is the only non-diverse Defendant, meaning that, upon its dismissal, the parties satisfy the complete diversity requirement of 28 U.S.C. § 1332.  As removal was proper and as Plaintiffs offer no other basis for remand of the case, Plaintiffs' Motion to Remand must be denied.